IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Percy Coleman, Administrator for the Estate of Philip Coleman, | ) ) ) | Case No. 12 cv 10061 |
| Plaintiff, | ) ) | JUDGE KENNELLY |
| vs. | ) ) ) | |
| The City of Chicago, Chicago Police Lieutenants Michael Rigoli, Star No. 235, and Carlos Mostek, Star No. 196, Chicago Police sergeants Sean Tully, Star No. 1090, William Meador, Star No. 1003, and Tommy Walker, Star No. 2328, and Chicago Police Officers Cordy Fouch, Star No. 19814, Mark Jones, Star No. 10390, David Montgomery, Star No. 10651, and Brian Hood, Star No. 10598, | ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Finnegan Jury Demand |
| Defendants. | ) | |

**DEFENDANTS' ADDITIONAL FACTS IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants Sgt. Tommy Walker and Keith Kirkland, by and through one of their attorneys, Arlene E. Martin, Chief Assistant Corporation Counsel, submit this statement of additional material facts[1] pursuant to Local Rule 56.1(b)(3)(c) of the United States District Court for the Northern District of Illinois.

1. Officer Malone advised detention aide Keith Kirkland that Mr. Coleman refused to leave the cell to go to court. (Def. Ex.2, pp 22-23).

2. Kirkland reported Mr. Coleman's refusal to leave the cell to his supervisor, Sgt. Walker who said he would go back there. (Def. Ex.2, p.27).

3. The next time Kirkland saw Mr. Coleman was when he, Sgt. Walker and other officers

---

[1] For clarity, defendants combined related facts into a short paragraph. Local rule 56.1(b)(3)(C)

returned to the cell to get Mr. Coleman out of it. (Def. Ex.2, p.29).

4. Sgt. Walker was informed that Philip Coleman was refusing to cooperate in being taken to court. (Def. Ex.3, pp.21, 22).

5. The first time Sgt. Walker saw Mr. Coleman was when he walked back to his cell and observed him sitting on the bench. (Def. Ex.3, pp.22-23).

6. Sgt. Walker asked Philip Coleman to cooperate to go to court and Mr. Coleman responded "Get thee behind me, Satan, or Lord rebuke you," or words to that effect. Sgt. Walker did not respond to Mr. Coleman but told the officer with him that Mr. Coleman would be sent to court with their wagon and returned to his desk. (Def. Ex.3, pp.23-24, 26).

7. Sgt. Walker told Officer Malone that Mr. Coleman needed to go to court and they had to get him out of the cell and he and other officers went to the cell with the plan to get Mr. Coleman out of the cell with the intent of having Mr. Coleman go on his own power. (Def. Ex.1, p.34-36; Def. Ex.11, pp.29, 31).

8. The next time Sgt. Walker saw Mr. Coleman was when he returned to the cell with four other officers to get him out of the cell because he was a big man and he had to go to court. (Def. Ex.3, p.27; Def. Ex.11, pp.25, 26).

9. It was part of the duties of Officers Mark Jones and Cordy Fouch to transport arrestees to court. Sgt. Walker advised them that Mr. Coleman was refusing to leave his cell to be transported to court and directed Officer Jones to assist. (Def. Ex.4, pp.17-18; Def. Ex.11, pp.21-24).

10. When the officers went to Mr. Coleman's cell he was sitting on the cell bed and repeatedly saying "Don't touch me" and Satanistic terminology. (Def. Ex.4, p.21).

11. Mr. Coleman made no response to Sgt. Walker trying to convince Mr. Coleman that he had to be transported to court and the officers entered the cell. It was expected that Mr. Coleman would stand up after being told it was time for court. (Def. Ex.1, pp.23, 24; Def. Ex.4, pp. 23-25; Def. Ex.11, p.30).

12. Sgt. Walker did not know the reasons for Mr. Coleman's arrest or what his behavior was during the previous night and had made no opinions about Mr. Coleman's state of mind. (Def. Ex.3, p.28).

13. Sgt. Walker directed that a Taser be used but only if needed. Sgt. Walker was trying to convince Mr. Coleman that he had to go to court but Mr. Coleman refused and continued to just sit and ignore the commands that he had to leave and go to court - stand, turn around, be handcuffed. When he told Officer Fouch to Tase Mr. Coleman Office Fouch refused. (Def. Ex.3 pp. 32, 36; Def. Ex.4, p.26; Def. Ex.11, pp.32-34, 36, 37).

14. Sgt. Walker gave a verbal command to Mr. Coleman to get up but he refused. (Def. Ex.1, pp.49, 50).

15. Mr. Coleman was resisting the officer's efforts to cuff him. (Def. Ex.4, pp.32-33).

16. When Mr. Coleman finally got off the bench he hopped up fast and stood in an aggressive manner, a fighting combative stance that was something like a boxer; not the normal way to stand up with at least one fist clenched, he became an assailant and Officer Fouch Tased him. (Def. Ex.1, pp. 39, 41; Def. Ex.7, pp.44-45; Def. Ex.11, pp.31-34, 36, 37, 39).

17. A Taser was a good control method and to prevent a big fight. When the Taser was deployed Mr. Coleman fell back down to the bench. (Def. Ex.3, pp.34, 36; Def. Ex.11, p.38).

18. After Mr. Coleman was Tased, he was spitting as he was grabbed and cuffed by the officers. (Def. Ex.1, pp.42, 45, 46).

19. It was after leg shackles were put on Mr. Coleman's legs that he was removed from the cell. (Def. Ex.4, p.33, 34).

20. Sgt. Walker made the decision to open the cell door and enter with the other officers while Mr. Coleman remained seated on the bench. (Def. Ex.3, pp.29-30).

21. Detention aide Kirkland heard Mr. Coleman tell the officers "Don't put your fucking hands on me" in what he believed to be in response to Sgt. Walker telling Mr. Coleman he would be cuffed to go to court. (Def. Ex.2, p.30, 31).

22. It was Kirkland's understanding from Sgt. Walker that they were going back to Mr. Coleman's cell to cuff him for transport to court. (Def. Ex.2, p.31).

23. From Kirkland's position behind other officers and while he was against a wall, he saw Mr. Coleman lunge forward up off of the cell bench. (Def. Ex.2, pp.32, 33).

24. Keith Kirkland knew an officer deployed the Taser when he felt an electric shock while he was holding the leg shackles causing him to let go of the shackles. (Def. Ex. 2, p.35, 36).

25. Keith Kirkland had attempted to put the leg shackles on Mr. Coleman's legs before the Taser was deployed, but was jolted by the Taser when it was deployed at Mr. Coleman after Mr. Coleman lunged forward toward the officers. Leg shackles are always placed on prisoners that are transported from jail to court. (Def. Ex.2, pp.34-35).

26. Keith Kirkland saw the officers were tussling with Mr. Coleman to get him cuffed while he was close to the kicking feet of Mr. Coleman. (Def. Ex.2, p.36, 38).

27. Keith Kirkland did not see Mr. Coleman kicking while he sat on the bench but did see

4

him kicking after he lunged off of the bench and during the whole scuffling. (Def. Ex.2, p.38).

28.     Mr. Coleman was conscious. Mr. Coleman was stiffened dead weight when Keith Kirkland pulled him out of the cell to the bullpen and he believed that was the safest way to end the situation. There was no need to carry Mr. Coleman and he could have walked but refused to obey orders to get up and walk. (Def. Ex.1, pp.49-50; Def. Ex.2, pp.40, 43; Def. Ex.3, pp. 40, 41, 44; Def. Ex.7, pp.53; Def. Ex.11, pp.56-57).

29.     Sgt. Walker believed the action of detention aide Kirkland was appropriate otherwise he would not have allowed Kirkland to pull Mr. Coleman to the desk area and would have ordered him to stop. If a person is resisting or just dead weight then you have to move him physically, and dragging is a possibility. (Def. Ex.3, p.42; Def. Ex.11, pp.56, 57).

30.     Police officers David Montgomery and Brian Hood were assigned to go to Roseland Community Hospital with Mr. Coleman and the Chicago Fire Department paramedics. (Def. Ex.5, pp.6, 9; Def. Ex.6, pp.1, 5, 7, 9, 10, 14).

31.     At the hospital, Officers Montgomery and Hood and the two paramedics tried to get Mr. Coleman under control when he started moving while still strapped to the gurney. During the attempt to remove the strap and controlling Mr. Coleman he caused the gurney to tip or flip over which caused everyone to fall to the floor. (Def. Ex.5, pp.22, 23).

32.     Mr. Coleman started steadily swinging his arms with handcuffed wrists hitting one paramedic in the upper body and spitting blood and saliva at Officer Hood. Hood removed his Taser, yelled for Mr. Coleman to stop, but instead Mr. Coleman rushed Officer Hood and grabbed the officer's hands and Taser trying to disarm the officer while Officer Hood tried to maintain control of the Taser. (Def. Ex. 5, p.21, 22, 26; Def. Ex.6, pp.21-26, 39).

33. Mr. Coleman had been knocked or deliberately taken to the floor multiple times in an effort to subdue and control him in the hospital. Mr. Coleman was Tased and hit with a baton. In the assigned room at the hospital's emergency room, Mr. Coleman popped back up off the floor, looked into Officer Montgomery's face who was standing in the room's doorway and said "Here I come" charging Officer Montgomery who was attempting to keep him in the room and prevent him from running past him out of the room. (Def. Ex.5, pp.24, 30-36; Def. Ex.6, 27-28, 30-32).

34. Mr. Coleman's actions in the hospital were relentless. After Coleman ran past him out of the room, Officer Montgomery stepped on Coleman's shackles to stop him from running through the general area of the emergency room, and with the assistance of others, Mr. Coleman was subdued and controlled on the floor of the emergency room where he continued to struggle against those who were holding him down until a nurse injected drugs into Mr. Coleman. (Def. Ex.5, pp.30, 34-36, 39).

35. Dr. Arunkumar testified that she usually sees linear bruises with handcuffs and the bruises that she saw on Mr. Coleman's wrists and forearms were not consistent with handcuffs nor did she describe them as linear bruises or abrasions in her autopsy report. (Def. Ex.8, pp.21-22).

36. Dr. Arunkumar describes the injuries around Mr. Coleman's wrists as slightly oblique, not like a straight injury and are not consistent with injuries caused by handcuffs, and that the abrasions and bruises at the wrist area do not have a pattern consistent with handcuff injuries, but it can be caused by a handcuff. (Def. Ex.8, pp.21-22, 76-77).

37. Jeffrey Noble's description of what he saw in a video as to how Mr. Coleman was taken out of the cell was Mr. Coleman handcuffed with his hands in front of him when the officer

6

pulled Mr. Coleman's hands up over his head and dragged him out of the cell and down the hallway by either holding Mr. Coleman's hand or the middle part of the handcuffs. (Def. Ex.9, pp.91-92).

38.     Tonya Pye gave no statements regarding the general use of force in a forced removal from a jail cell or specifically a removal of a prisoner by pulling or dragging him out of a cell because he resisted being taken to court. (Def. Ex.10, Pye Dep w/attachment Ex.1).

                Respectfully submitted,

                **Arlene E. Martin**
                Chief Assistant Corporation Counsel
                Attorney for Defendants

30 No. LaSalle Street - Suite 900
Chicago, Illinois 60602
312.744.6949