IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Percy Coleman, Administrator for the Estate of Philip Coleman ) ) ) ) Plaintiff, ) ) ) v. ) ) The City of Chicago, Chicago Police Lieutenants ) Michael Rigoli, Star No. 235, and Carlos ) Mostek, Star No. 196, Chicago Police Sergeants ) Sean Tully, Star No. 1090, William Meador, ) Star No. 1003, and Tommy Walker, Star No. ) 2328, and Chicago Police Officers Cordy Fouch, ) Star No. 19814, Mark Jones, Star No. 10390, ) David Montgomery, Star No. 10651, and Brian ) Hood, Star No. 10598, ) ) Defendants. | Case No.: 12 cv 10061<br><br>**JUDGE KENNELLY** |

**PLAINTIFF'S REPLY
TO DEFENDANTS' ADDITIONAL FACTS IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by his attorney of record, submit this Reply to Defendants' statement of additional material facts pursuant to Local Rule 56.1.

1. Officer Malone advised detention aide Keith Kirkland that Mr. Coleman refused to leave the cell to go to court. (Def. Ex.2, pp 22-23).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this

objection: **Admit[1]**.

2. Kirkland reported Mr. Coleman's refusal to leave the cell to his supervisor, Sgt. Walker who said he would go back there. (Def. Ex.2, p.27).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

3. The next time Kirkland saw Mr. Coleman was when he, Sgt. Walker and other officers returned to the cell to get Mr. Coleman out of it. (Def. Ex.2, p.29).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

4. Sgt. Walker was informed that Philip Coleman was refusing to cooperate in being taken to court. (Def. Ex.3, pp.21, 22).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

5. The first time Sgt. Walker saw Mr. Coleman was when he walked back to his cell and observed him sitting on the bench. (Def. Ex.3, pp.22-23).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

---

[1] All admissions of Plaintiff to the facts asserted by the Defendants are intended solely for purposes of Plaintiff's Motion for Summary Judgment, and Plaintiff reserves the right to dispute these facts for all other purposes, including trial.

6.      Sgt. Walker asked Philip Coleman to cooperate to go to court and Mr. Coleman responded "Get thee behind me, Satan, or Lord rebuke you," or words to that effect. Sgt. Walker did not respond to Mr. Coleman but told the officer with him that Mr. Coleman would be sent to court with their wagon and returned to his desk. (Def. Ex.3, pp.23-24, 26).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit**.

7.      Sgt. Walker told Officer Malone that Mr. Coleman needed to go to court and they had to get him out of the cell and he and other officers went to the cell with the plan to get Mr. Coleman out of the cell with the intent of having Mr. Coleman go on his own power. (Def. Ex.1, p.34-36; Def. Ex.11, pp.29, 31).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit** that this statement is supported by the cited portion of Defendant Malone's deposition. However, note that Defendant Fouch contradicted Malone, and testified Sgt. Walker did not discuss any plan of action as to how Coleman was going to be removed from his cell. (Fouch Dep., Pltf. Ex. I, pg. 25-26)[2]

8.      The next time Sgt. Walker saw Mr. Coleman was when he returned to the cell with four other officers to get him out of the cell because he was a big man and he had to go to court. (Def. Ex.3, p.27; Def. Ex.11, pp.25, 26).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it

---

[2] Unless otherwise indicated Plaintiff's responses that cite to exhibits refer to the exhibits attached to Plaintiff's Appendix of Exhibits to Local Rule 56.1 Reply filed simultaneously herewith.

is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: Plaintiff **DENIES** that Sgt. Walker "returned to the cell with four other officers," because there were a total of six officers present, including Sgt. Walker. (Malone Dep., Pltf. Ex. H, pg. 35).

9.  It was part of the duties of Officers Mark Jones and Cordy Fouch to transport arrestees to court. Sgt. Walker advised them that Mr. Coleman was refusing to leave his cell to be transported to court and directed Officer Jones to assist. (Def. Ex.4, pp.17-18; Def. Ex.11, pp.21-24).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

10.  When the officers went to Mr. Coleman's cell he was sitting on the cell bed and repeatedly saying "Don't touch me" and Satanistic terminology. (Def. Ex.4, p.21).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection plaintiff notes that the video demonstrates that when the six officers approached Coleman's cell he was lying down and his mouth was not moving, and after the officers arrived Coleman sat up. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m.)[3]
Plaintiff **admits** Coleman was "repeatedly saying 'Don't touch me' and Satanistic terminology."

11.  Mr. Coleman made no response to Sgt. Walker trying to convince Mr. Coleman that he

---

[3] This exhibit refers to the CD containing video recordings previously labeled as Plaintiff's Exhibit F, and filed under Docket entry 173, and a courtesy copy of the CD was previously delivered to the Court.

had to be transported to court and the officers entered the cell. It was expected that Mr. Coleman would stand up after being told it was time for court. (Def. Ex.1, pp.23, 24; Def. Ex.4, pp. 23-25; Def. Ex.11, p.30).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Deny.** The video demonstrates that after plaintiff was told to stand up he complied by standing up, and he was immediately tasered. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m.(Dkt. 173))

12. Sgt. Walker did not know the reasons for Mr. Coleman's arrest or what his behavior was during the previous night and had made no opinions about Mr. Coleman's state of mind. (Def. Ex.3, p.28).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

13. Sgt. Walker directed that a Taser be used but only if needed. Sgt. Walker was trying to convince Mr. Coleman that he had to go to court but Mr. Coleman refused and continued to just sit and ignore the commands that he had to leave and go to court - stand, turn around, be handcuffed. When he told Officer Fouch to Tase Mr. Coleman Office Fouch refused. (Def. Ex.3 pp. 32, 36; Def. Ex.4, p.26; Def. Ex.11, pp.32-34, 36, 37).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this

objection:**Admit.**

14. Sgt. Walker gave a verbal command to Mr. Coleman to get up but he refused. (Def. Ex.1, pp.49, 50).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

15. Mr. Coleman was resisting the officer's efforts to cuff him. (Def. Ex.4, pp.32-33).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit** Defendant Jones testified Coleman resisted being handcuffed during the period of time Defendant Fouch was tasering Coleman. (Jones Dep., Pltf. Ex. G, pg. 30-33)

16. When Mr. Coleman finally got off the bench he hopped up fast and stood in an aggressive manner, a fighting combative stance that was something like a boxer; not the normal way to stand up with at least one fist clenched, he became an assailant and Officer Fouch Tased him. (Def. Ex.1, pp. 39, 41; Def. Ex.7, pp.44-45; Def. Ex.11, pp.31-34, 36, 37, 39).

**RESPONSE: Deny.** The video demonstrates that after plaintiff was told to stand up he complied by standing up, and he was immediately tasered. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m. (Dkt. No. 173))

17. A Taser was a good control method and to prevent a big fight. When the Taser was

deployed Mr. Coleman fell back down to the bench. (Def. Ex.3, pp.34, 36; Def. Ex.11, p.38).

**RESPONSE: Deny.** According to the City of Chicago's Rule 30(b)(6) witness, Tonya Pye, an arrestee's verbal refusal to be transported to court is not a sufficient basis for a Chicago Police officer to bring a taser into the lockup area. (Pye Dep., Pltf. Ex. C, pg. 50-52) **Admit** that after the taser was deployed Coleman fell backwards onto the bench in his cell.

18. After Mr. Coleman was Tased, he was spitting as he was grabbed and cuffed by the officers. (Def. Ex.1, pp.42, 45, 46).

**RESPONSE: Deny.** The cited testimony does not establish that Coleman was spitting at anyone. Officer Malone clearly testified that while Coleman was being handcuffed he had "a little bit" of spit around the outside of his mouth, but he was not spitting at any one. (Malone Dep., Pltf. Ex. H, pg. 45-46)

19. It was after leg shackles were put on Mr. Coleman's legs that he was removed from the cell. (Def. Ex.4, p.33, 34).

**RESPONSE:** Admit.

20. Sgt. Walker made the decision to open the cell door and enter with the other officers while Mr. Coleman remained seated on the bench. (Def. Ex.3, pp.29-30).

**RESPONSE:** Admit.

21. Detention aide Kirkland heard Mr. Coleman tell the officers "Don't put your fucking hands on me" in what he believed to be in response to Sgt. Walker telling Mr. Coleman he

would be cuffed to go to court. (Def. Ex.2, p.30, 31).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit**.

22. It was Kirkland's understanding from Sgt. Walker that they were going back to Mr. Coleman's cell to cuff him for transport to court. (Def. Ex.2, p.31).

**RESPONSE:** Admit.

23. From Kirkland's position behind other officers and while he was against a wall, he saw Mr. Coleman lunge forward up off of the cell bench. (Def. Ex.2, pp.32, 33).

**RESPONSE: Deny.** The video demonstrates that after plaintiff was told to stand up he complied by standing up, and he was immediately tasered before he could make any "lunge forward." (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m. (Dkt. No. 173))

24. Keith Kirkland knew an officer deployed the Taser when he felt an electric shock while he was holding the leg shackles causing him to let go of the shackles. (Def. Ex. 2, p.35, 36).

**RESPONSE: Deny.** The video demonstrates that Kirkland was present inside Coleman's cell looking at Coleman when the taser was initially deployed causing Coleman to fall backwards. The video demonstrates that it was after Coleman fell backwards that all the officers, including Kirkland, then began the process of placing handcuffs and shackles on Coleman. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m. (Dkt. No. 173))

25. Keith Kirkland had attempted to put the leg shackles on Mr. Coleman's legs before

the Taser was deployed, but was jolted by the Taser when it was deployed at Mr. Coleman after Mr. Coleman lunged forward toward the officers. Leg shackles are always placed on prisoners that are transported from jail to court. (Def. Ex.2, pp.34-35).

**RESPONSE:** Deny. Kirkland testified that he does not recall if an attempt was made to put shackles on Coleman before that taser was deployed. (Kirkland Dep., Pltf. Ex. A, pg. 34). The video demonstrates that Kirkland was present inside Coleman's cell looking at Coleman when the taser was initially deployed causing Coleman to fall backwards. The video demonstrates that it was after Coleman fell backwards that all the officers, including Kirkland, then began the process of placing handcuffs and shackles on Coleman. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m. (Dkt. No. 173))


26. Keith Kirkland saw the officers were tussling with Mr. Coleman to get him cuffed while he was close to the kicking feet of Mr. Coleman. (Def. Ex.2, p.36, 38).

**RESPONSE: Deny** that the cited testimony establishes that Kirkland saw what other officers were doing. **Admit** that Kirkland testified that he was close to Coleman's feet.

27. Keith Kirkland did not see Mr. Coleman kicking while he sat on the bench but did see him kicking after he lunged off of the bench and during the whole scuffling. (Def. Ex.2, p.38).

**RESPONSE: Admit** Kirkland did not see Coleman kicking while he sat on the bench. **Deny** that Coleman "lunged off the bench." The video demonstrates that Kirkland was present inside Coleman's cell looking at Coleman when the taser was initially deployed causing Coleman to fall backwards. The video demonstrates that it was after Coleman fell backwards that all the officers, including Kirkland, then began the process of placing handcuffs and

shackles on Coleman. (Video file labeled "Camera 7 cell I" at 7:26 a.m. through 7:29 a.m. (Dkt. No. 173)). **Admit** that Kirkland claim he saw Coleman kick while he was "scuffling."

28. Mr. Coleman was conscious. Mr. Coleman was stiffened dead weight when Keith Kirkland pulled him out of the cell to the bullpen and he believed that was the safest way to end the situation. There was no need to carry Mr. Coleman and he could have walked but refused to obey orders to get up and walk. (Def. Ex.1, pp.49-50; Def. Ex.2, pp.40, 43; Def. Ex.3, pp. 40, 41, 44; Def. Ex.7, pp.53; Def. Ex.11, pp.56-57).

**RESPONSE: Deny** that any of the cited testimony establishes that Coleman was conscious when he was dragged out of his cell by Kirkland. The cited testimony of Malone does not include testimony as to whether Coleman was conscious only that he was refusing verbal commands. (Malone Dep, Pltf. Ex. H, pg. 49-50). The cited testimony of Kirkland and Fouch indicating a belief that Coleman was conscious refers to a point in time after Coleman had already been dragged out of his cell to a different location where he was treated by paramedics. (Kirkland dep., Pltf. Ex. A, pg. 42-43; Fouch dep., Pltf. Ex. I, pg. 56-57) Walker's cited testimony does not establish Coleman was conscious, but only his belief that he "appeared to be" despite his inability to see Coleman's eyes. (Walker Dep, Pltf. Ex. B, pg. 41-42) The cited testimony of Meador does not contain any testimony indicating that Coleman was conscious. (Meador Dep, Pltf. Ex. F, pg. 53).

The paramedics that encountered Coleman in the lockup documented that when they arrived Coleman appeared to be unconscious. (Jordan Dep, Pltf. Ex. J, pg. 13-14, 21-22)

**Admit** that Kirkland dragged Coleman out of the cell.

**Admit** that Kirkland testified that he believed that was the safest way to end the situation. Additionally Kirkland testified that rather than give Coleman an opportunity to walk out of the cell it was safer to pull him by the handcuffs. (Kirkland Dep., Pltf. Ex. A, pg. 40-41). **Deny** that this is true. Defendants' own expert witness testified that this was not the safest or even an appropriate way to remove Coleman. (Noble Dep., Pltf. Ex. E, pg. 92-93). Specifically their own police expert testified that it was not appropriate to "drag" Coleman on the floor through the lockup because they had sufficient personnel to pick him up, they could have used a chair with wheels, or the paramedics' gurney. He also noted that police personnel originally carried him into his cell and thus they could have carried him out. (Noble Dep., Pltf. Ex. E, pg. 92-93)

29. Sgt. Walker believed the action of detention aide Kirkland was appropriate otherwise he would not have allowed Kirkland to pull Mr. Coleman to the desk area and would have ordered him to stop. If a person is resisting or just dead weight then you have to move him physically, and dragging is a possibility. (Def. Ex.3, p.42; Def. Ex.11, pp.56, 57).

**RESPONSE: Admit** that Sgt. Walker testified the he believe Kirkland dragging Coleman by the handcuff was appropriate and could have ordered him to stop. **Deny** that it was necessary to drag Coleman. Defendants' own expert witness testified that this was not a safe or even appropriate way to remove Coleman. (Noble Dep., Pltf. Ex. E, pg. 92-93)

30. Police officers David Montgomery and Brian Hood were assigned to go to Roseland Community Hospital with Mr. Coleman and the Chicago Fire Department paramedics. (Def. Ex.5, pp.6, 9; Def. Ex.6, pp.1, 5, 7, 9, 10, 14).

**RESPONSE:** Admit.

31. At the hospital, Officers Montgomery and Hood and the two paramedics tried to get Mr.

Coleman under control when he started moving while still strapped to the gurney. During the attempt to remove the strap and controlling Mr. Coleman he caused the gurney to tip or flip over which caused everyone to fall to the floor. (Def. Ex.5, pp.22, 23).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit.**

32. Mr. Coleman started steadily swinging his arms with handcuffed wrists hitting one paramedic in the upper body and spitting blood and saliva at Officer Hood. Hood removed his Taser, yelled for Mr. Coleman to stop, but instead Mr. Coleman rushed Officer Hood and grabbed the officer's hands and Taser trying to disarm the officer while Officer Hood tried to maintain control of the Taser. (Def. Ex. 5, p.21, 22, 26; Def. Ex.6, pp.21-26, 39).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit**.

33. Mr. Coleman had been knocked or deliberately taken to the floor multiple times in an effort to subdue and control him in the hospital. Mr. Coleman was Tased and hit with a baton. In the assigned room at the hospital's emergency room, Mr. Coleman popped back up off the floor, looked into Officer Montgomery's face who was standing in the room's doorway and said "Here I come" charging Officer Montgomery who was attempting to keep him in the room and prevent him from running past him out of the room. (Def. Ex.5, pp.24, 30-36; Def. Ex.6, 27-28, 30-32).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it

is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit**.

34. Mr. Coleman's actions in the hospital were relentless. After Coleman ran past him out of the room, Officer Montgomery stepped on Coleman's shackles to stop him from running through the general area of the emergency room, and with the assistance of others, Mr. Coleman was subdued and controlled on the floor of the emergency room where he continued to struggle against those who were holding him down until a nurse injected drugs into Mr. Coleman. (Def. Ex.5, pp.30, 34-36, 39).

**RESPONSE:** Plaintiff objects to this statement of additional fact on the ground that it is immaterial to the issues raised in Plaintiff's Motion for Summary Judgment. Subject to this objection: **Admit**.

35. Dr. Arunkumar testified that she usually sees linear bruises with handcuffs and the bruises that she saw on Mr. Coleman's wrists and forearms were not consistent with handcuffs nor did she describe them as linear bruises or abrasions in her autopsy report. (Def. Ex.8, pp.21- 22).

**RESPONSE: Deny.** After having an opportunity review autopsy photographs Dr. Arunkumar testified that the wrist injuries depicted in the photographs could have been caused by handcuffs. (Dr. Arunkumar Dep., Pltf. Ex. D, pg. 75-77)

36. Dr. Arunkumar describes the injuries around Mr. Coleman's wrists as slightly oblique, not like a straight injury and are not consistent with injuries caused by handcuffs, and that the abrasions and bruises at the wrist area do not have a pattern consistent with handcuff injuries, but it can be caused by a handcuff. (Def. Ex.8, pp.21-22, 76-77).

**RESPONSE: Deny.** After having an opportunity review autopsy photographs Dr. Arunkumar testified that the wrist injuries depicted in the photographs could have been caused by handcuffs. (Dr. Arunkumar Dep., Pltf. Ex. D, pg. 75-77)

37. Jeffrey Noble's description of what he saw in a video as to how Mr. Coleman was taken out of the cell was Mr. Coleman handcuffed with his hands in front of him when the officer pulled Mr. Coleman's hands up over his head and dragged him out of the cell and down the hallway by either holding Mr. Coleman's hand or the middle part of the handcuffs. (Def. Ex.9, pp.91-92).

**RESPONSE: Admit** that this accurately states a portion of Mr. Noble's testimony.

38. Tonya Pye gave no statements regarding the general use of force in a forced removal from a jail cell or specifically a removal of a prisoner by pulling or dragging him out of a cell because he resisted being taken to court. (Def. Ex.10, Pye Dep w/attachment Ex.1).

**RESPONSE:** Deny. Tonya Pye has been employed by the Chicago Police Department for more than 23 years. She has been assigned to the Chicago Police Deparment's Central Detention Section for more than 15 years. In that capacity her duties include providing instruction to new detention aides at the Chicago Police Academy. (Pye Dep., Pltf. Ex. C, pg. 6-8) Pye testified that detention aides received training in the use of handcuffs on individuals that appear to be irrational and delusional (Pye Dep., Pltf. Ex. C, pg. 72) Pye testified that she has never received any training that it is within policy or procedure to pull an arrestee along the floor by handcuffs when they appear to be irrational or delusional. (Pye Dep., Pltf. Ex. C, 74-75)

Respectfully submitted,

/S/Garrett Browne

ED FOX & ASSOCIATES
Suite 330
300 W. Adams
Chicago, IL. 60606
(312) 345-8877