# EXHIBIT A

Coleman vs. City of Chicago
Keith Kirkland - 01/22/2014

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3

    Percy Coleman, Administrator for )
 4  the Estate of Philip Coleman,    )
                                     )
 5              Plaintiff,           )
                                     )
 6       vs.                         )  NO. 12 CV 10061
                                     )
 7  The City of Chicago, Chicago     )
    Police Lieutenants Michael       )
 8  Rigoli, Star No. 235, Carlos     )
    Mostek, Star No. 196, and        )
 9  Michael Casey, Star No. 191,     )
    Chicago Police Sergeants Sean    )
10  Tully, Star No. 1090, William    )
    Meador, Star No. 1003, and       )
11  Tommy Walker, Star No. 2328, and )
    Chicago Police Officers Cordy    )
12  Fouch, Star No. 19814, Mark      )
    Jones, Star No. 10390, David     )
13  Montgomery, Star No. 10651,      )
    Brian Hood, Star No. 10598,      )
14  Reginald T. Malone, Star         )
    No. 17484, and Detention Aide    )
15  Keith Kirkland,                  )
                                     )
16              Defendants.          )

17

18          The deposition of KEITH KIRKLAND, called by
    the Plaintiff for examination, taken pursuant to
19  notice and pursuant to the Federal Rules of Civil
    Procedure for the United States District Courts
20  pertaining to the taking of depositions, taken before
    Cheryl R. Cicero, Certified Shorthand Reporter, at
21  300 West Adams Street, Suite 330, Chicago, Illinois,
    commencing at 1:30 p.m. on the 22nd day of January,
22  A.D., 2014.

23

24
```


JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Keith Kirkland - 01/22/2014

Page 34

```
 1          Q.   Okay.   The wall --

 2          A.   So someone was, like, in front of me.

 3          Q.   Somebody was in front of you?

 4          A.   Yes.

 5          Q.   Do you remember who that was?

 6          A.   No.

 7          Q.   Okay.   So after he lunged toward somebody,

 8   what was the next thing that happened?

 9          A.   We tried to subdue him.

10          Q.   And how did you do that?

11          A.   By trying to cuff him up.

12          Q.   And can you describe how that worked, how

13   that happen?

14          A.   I grabbed his leg.

15          Q.   Is this -- Was that before he was tased or

16   after he was tased?

17          A.   I'm not sure about that.

18          Q.   Did you know he was tased?

19          A.   I know the Taser went off, yes.

20          Q.   Okay.   Did you know -- Did you know the Taser

21   went off when it went off in the cell?

22          A.   No.

23          Q.   When did you learn the Taser went off.

24          A.   When did I learn?
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com



Coleman vs. City of Chicago
Keith Kirkland - 01/22/2014

```
 1          Q.   After that happened he was still in his cell,

 2   correct?

 3          A.   Yes.

 4          Q.   And then what did you do with him after you

 5   got the the shackles and handcuffs on him?

 6          A.   I pulled him out of the cell to the -- down

 7   by the bullpen.

 8          Q.   Okay.  Before you pulled him out of his cell

 9   did you try to stand him up?

10          A.   No.

11          Q.   And why not?

12          A.   Because I thought that was the safest way to

13   pull him out and end the situation.

14          Q.   And why did you think that was the safest way

15   to pull him out?

16          A.   Because he was fighting with us.

17          Q.   Okay.

18          A.   And all of us couldn't fit in there.  There

19   was a bunch of us in the cell.

20          Q.   Okay.  So you felt rather than give him an

21   opportunity to walk out of the cell, it would be safer

22   just to pull him out of the cell by his handcuffs?

23          MS. MARTIN:  Objection to the form of the

24   question.
```



```
 1   BY MR. FOX:

 2        Q.   You can answer.

 3        MS. MARTIN:   If you understand the question as

 4   it's asked.

 5   BY MR. FOX:

 6        Q.   Do you understand?

 7        A.   No.  Could you say it again?

 8        MR. FOX:   Sure.  Could you read that back?

 9                        (Record read back as requested.)

10   BY THE WITNESS:

11        A.   Yes.

12        Q.   And can you describe how you did that.

13        A.   I grabbed the cuffs and pulled him out.

14        Q.   Okay.  So when you say you grabbed the cuffs,

15   are you referring to the chain between each cuff?

16        A.   Yes.

17        Q.   After he was cuffed was he still fighting

18   with any of the officers that you observed?

19        A.   I'm not sure.

20        Q.   Okay.  And you said you pulled him down to

21   the bullpen?

22        A.   Yes.

23        Q.   And that would be the holding cell?

24        A.   Exactly.
```



JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Keith Kirkland - 01/22/2014                                                   Page 42

```
 1          Q.   Okay.  Did anybody make a joke about anything

 2     that caused you guys to laugh at about the time you

 3     were pulling him out of the cell?

 4          A.   We laughed because we got tased, me and

 5     Sergeant Meador.

 6          Q.   So you and Sergeant Meador were laughing

 7     because you both got tased?

 8          A.   Yes.

 9          Q.   And did Sergeant Meador indicate what part of

10     his body got jolted?

11          A.   I think his foot.

12          Q.   Okay.  And did you receive any training that

13     would be an appropriate way to move somebody, by

14     grabbing their handcuffs and pulling them as you've

15     described it?

16          A.   No.

17          Q.   Okay.  So once he was taken out -- You took

18     him out in front of the holding cell; is that right?

19          A.   Yeah.

20          Q.   And then you folks waited for the EMS people

21     to arrive?

22          A.   I called.

23          Q.   You notified them?

24          A.   Yes, I notified the desk to call an
```



JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Keith Kirkland - 01/22/2014

Page 43

1    ambulance.

2         Q.   All right.   And then did you wait with

3    Coleman while that was going on?

4         A.   Yes, other than walking behind the desk to

5    call.

6         Q.   How much time elapsed between the time that

7    you called and the time they arrived?

8         A.   I can't recall.

9         Q.   During the time -- From the time you pulled

10   him out of the cell to the time the EMS folks arrived

11   did you hear Coleman saying anything?

12        A.   No.

13        Q.   Was he making any more biblical references

14   that you heard?

15        A.   No.

16        Q.   Did he appear to be conscious while he was in

17   front of the cell?

18        A.   Yes, he was.

19        Q.   Okay.   Did you observe the EMS folks treat

20   Mr. -- or -- yeah, treat Mr. -- Let me rephrase that.

21             Did you observe the EMS folks to examine

22   Mr. Coleman?

23        A.   I was there when they came.

24        Q.   And what did you see them do with him?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

# EXHIBIT B

Coleman vs. City of Chicago
Officer Tommy J. Walker - 01/16/2014

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS

2               EASTERN DIVISION

3

    PERCY COLEMAN,           )

4    Administrator for the    )
    Estate of Philip Coleman,   )

5                    )
             Plaintiff,   )

6                    )
          vs.         )  No. 12 CV 10061

7                    )
    THE CITY OF CHICAGO,     )

8    Chicago Police Lieutenants  )
    MICHAEL RIGOLI, Star     )

9     No. 235, et al.,      )
                   )

10             Defendants.  )

11

12        The deposition of OFFICER TOMMY J. WALKER,

13 called by the Plaintiff for examination, taken pursuant

14 to notice and pursuant to the Federal Rules of Civil

15 Procedure for the United States District Courts

16 pertaining to the taking of depositions, taken before

17 Zona B. Miller, CSR, at 300 West Adams Street,

18 Suite 300, Chicago, Illinois, commencing at 10:20 a.m.

19 on January 16, 2014.

20

21

22

23

24

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Officer Tommy J. Walker - 01/16/2014

Page 41

```
 1    did it.   Just pulled him.
 2         Q.    Do you know what part of -- how Mr. Kirkland
 3    was holding onto Mr. Coleman in order to pull him?
 4         A.    No.
 5         Q.    And what's the approximate distance from
 6    Mr. Coleman's cell to that area across from the desk in
 7    the lockup?
 8         A.    I do not know.
 9         Q.    Do you know if it's more than 20 feet?
10         A.    I do not know.
11         Q.    Do you know if Mr. Kirkland was -- you said --
12    I'm sorry.  Did you say pulling him?
13         A.    Yes.
14         Q.    When Mr. Kirkland was pulling Mr. Coleman, was
15    Mr. Coleman lying on the floor?
16         A.    Yes.
17         Q.    Did Mr. -- from what you were able to see, did
18    Mr. Coleman resist any efforts to be pulled by
19    Mr. Kirkland?
20         A.    No.
21         Q.    When Mr. Coleman was being pulled on the floor
22    by Mr. Kirkland, did he appear to be conscious from what
23    you could see?
24         A.    I would say yes.
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Officer Tommy J. Walker - 01/16/2014                                    Page 42

```
 1        Q.   And in your opinion, why do you believe
 2   Mr. Coleman was conscious?
 3        A.   He just appeared to be.
 4        Q.   Okay.  Were his eyes open?
 5        A.   He was being pulled on the floor.  I could not
 6   see his eyes.
 7        Q.   And by the way, you were present the entire
 8   time that Mr. Kirkland was pulling Mr. Kirkland --
 9   strike that.
10             Is it correct that you were present the entire
11   time that Mr. Kirkland was pulling Mr. Coleman on the
12   floor to the lockup area -- to the desk area?
13        A.   Yes.
14        Q.   That was done under your supervision?
15        A.   I was there.
16        Q.   Were you watching it the whole time?
17        A.   Yes.
18        Q.   If you thought there was something
19   inappropriate about that, you could have ordered
20   Mr. Kirkland to stop; is that correct?
21        A.   That is correct.
22        Q.   While Mr. Coleman was being pulled along the
23   floor, was Mr. Coleman saying anything you can recall?
24        A.   No.
```



Coleman vs. City of Chicago
Officer Tommy J. Walker - 01/16/2014

Page 48

 1        Q.    What do you base your opinion that he was

 2   conscious on?

 3        A.    The same -- because I had no reason to believe

 4   he was unconscious.

 5        Q.    Anything else?

 6        A.    No.

 7        Q.    While you were standing there near Mr. Coleman

 8   with several other police personnel, do you recall any

 9   conversation with any of the police personnel?

10        A.    No.

11        Q.    Do you recall hearing anything that any other

12   police personnel were saying?

13        A.    No.

14        Q.    Do you recall any of the police personnel

15   present laughing or smiling?

16        A.    Yes, we were.

17        Q.    You were?

18        A.    Yes.

19        Q.    What were you laughing about?

20        A.    I don't know.

21        Q.    Do you recall if somebody was telling jokes?

22        A.    I don't know.

23        Q.    You don't recall what was funny?

24        A.    No.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PERCY COLEMAN, Administrator for           )
the Estate of PHILIP COLEMAN,              )
                                           )
          Plaintiff,                       )
                                           )
     -vs-                                  )No. 12 cv 10061
                                           )
THE CITY OF CHICAGO, CHICAGO POLICE        )
LIEUTENANTS MICHAEL RIGOLI, STAR NO.       )
235, CARLOS MOSTEK, STAR NO. 196, and      )
MICHAEL CASEY,STAR NO. 191; CHICAGO        )
POLICE SERGEANTS SEAN TULLY, STAR NO.      )
1090, WILLIAM MEADOR, STAR NO. 1003,       )
and TOMMY WALKER, STAR NO. 2328; and       )
CHICAGO POLICE OFFICERS CORDY FOUCH,       )
STAR NO. 19814, MARK JONES, STAR NO.       )
10390, DAVID MONTGOMERY, STAR NO.          )
10651, BRIAN HOOD, STAR NO. 10598,         )
REGINALD T. MALONE, STAR NO. 17484;        )
and DETENTION AIDE KEITH KIRKLAND,         )
                                           )
          Defendants.                      )
_____    )

          The deposition of TONYA PYE, called by the
Plaintiff for examination, pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the United States District Courts pertaining to the
taking of depositions, taken before Pamela L.
Cosentino, Certified Shorthand Reporter within and for
the County of Cook and State of Illinois, at 300 West
Adams, Suite 330, Chicago, Illinois, commencing at the
hour of 10:03 a.m., on the 17th day of October, 2014.


Reported by:  Pamela L. Cosentino, CSR
License No.:  084-003601

                                                      1

1    well.  And I believe that's it as to this deposition.

2              MR. FOX:  That's my understanding too.  I

3    just want to make sure.

4              MR. MOWATT:  We're on the same page.

5    BY MR. FOX:

6        Q.    Officer Pye, I know you're currently employed

7    by the Chicago Police Department, but how long have

8    you worked there?

9        A.    23 years, off eight months.

10       Q.    Do you have any current plans on retiring?

11       A.    I am planning to retire March 15, 2016.

12       Q.    What is your current assignment with the

13   Chicago Police Department?

14       A.    I'm assigned to the Central Detention

15   Section, Unit 171.

16       Q.    How long have you been assigned there?

17       A.    15 years, ten months.

18       Q.    Where is the Central Detention Section

19   located?

20       A.    1718 South State Street.

21       Q.    That's the location where you're assigned.

22   What are your duties there?

23       A.    My duties at the Central Detention Section

24   include unit secretary, lockup keeper, prisoner van

6

1    driver or attendant; at times I'm also called to

2    provide instruction to new detention aides at the

3    police academy.

4         Q.    I guess we're talking about 15 years ago.

5    Before being assigned to Central Detention Section,

6    where were you assigned?

7         A.    The Fifth District.

8         Q.    How long were you assigned to the Fifth

9    District?

10        A.    Seven years.

11        Q.    So it sounds like those two locations cover

12   the vast majority of your career with the Chicago

13   Police Department?

14        A.    Yes.

15        Q.    And when you were assigned to the Fifth

16   District for approximately seven years, what were your

17   duties there?

18        A.    I was a beat officer, lockup keeper, desk

19   officer.

20        Q.    Now, I think you indicated earlier that on

21   occasion you're called upon to train detention aides?

22        A.    Yes.

23        Q.    And that training that you provide to

24   detention aides, that's at the police academy?

                                                      7

1      A.    Yes.

2      Q.    Approximately how often do you train

3  detention aides at the academy?

4      A.    Whenever they hire new detention aides, in

5  the last couple of years it's been three times since

6  2011 there have been three new classes of detention

7  aides.  So over the last few years it's been three

8  times.

9      Q.    So three -- if I understand your answer, you

10  provided training to three new detention aide classes

11  since 2011?

12      A.    Yes.  But I also -- well, I could go back to

13  2005 as well.  I provided training for a new class in

14  2005.  So it's been four classes of new detention

15  aides since 2005.

16      Q.    Since 2005 there's been a total of four

17  classes that you trained?

18      A.    Yes.

19      Q.    Three since 2011?

20      A.    Yes.

21      Q.    Let's just focus on from 2011.  When you're

22  providing training to detention aides, are these

23  new -- these are new recruits to become -- or new

24  individuals that are training to become new he

8

1     Q.    These are not optional, correct?

2     A.    No.   Correct.

3     Q.    So if we could look at, it's responsibility

4   number A-5 where it states "neither carry or keep any

5   weapons within the lockup"; do you see that?

6     A.    Yes.

7     Q.    In terms of what constitutes a weapon, does

8   that include tasers?

9     A.    Yes, a taser is a weapon.

10    Q.    Within the meaning of this policy is taser

11  considered a weapon?

12    A.    Yes, it's a weapon, but I believe when -- I

13  don't believe that was -- yeah, it's a weapon.

14          But also if we go to the note, if a person

15  has a weapon on, a taser on or any weapon on in the

16  case of an emergency, it does --

17    Q.    Right.   We're going to get to that.

18          But I just want to first establish that a

19  taser is considered a weapon?

20    A.    Correct.

21    Q.    Now, as you point out, number 6 states:

22  "Not permit any department member to carry a weapon

23  when entering a lockup.   Note:   This does not prohibit

24  department members from responding to an emergency in

50

1    the lockup with weapons."

2        A.    Yes.

3        Q.    So does that mean if there is an emergency

4    going on in the lockup, a department member will be

5    allowed to bring a taser into the lockup if necessary?

6        A.    Yes.

7        Q.    But if there's not an emergency, tasers are

8    not permitted in the lockup; is that correct?

9        A.    Correct.

10       Q.    So I wanted to go through with you what

11   constitutes an emergency in the lockup.

12       A.    Okay.

13       Q.    If an arrestee is verbally refusing to leave

14   their cell, is that an emergency?

15            MR. MOWATT:  I'm going to object to the

16   incomplete hypothetical.  It calls for speculation,

17   form, and foundation.

18            Go ahead and answer.

19            THE WITNESS:  That would depend on the

20   situation.

21   BY MR. FOX:

22       Q.    What more do you need to know?  An arrestee

23   is in their cell, they're verbally saying they are not

24   going to leave.  Does that constitute an emergency

                                              51

1    that would warrant bringing a taser into the lockup?

2           MR. MOWATT:  I'm going to renew my

3    objections.

4           Go ahead and answer.

5           THE WITNESS:  I would -- for me to answer

6    clearly that question, I would need to know why did

7    the arrestee need to leave the cell?  Was he being

8    bonded?  Was he going to the hospital?  What was the

9    situation?  Why did the person -- why were they asking

10   him to come out of the cell?

11   BY MR. FOX:

12      Q.   So in a scenario where an arrestee is in

13   their cell, they've been in custody for approximately

14   12 hours, and it's the morning time and it's time for

15   them to be transported to court, and the arrestee has

16   indicated they do not want to go to court.

17           In your training and experience, does that

18   constitute an emergency that would allow, under this

19   policy, for a taser to be brought into the lockup?

20           MR. MOWATT:  I'm going to renew my objection

21   as to this incomplete hypothetical.  It calls for

22   speculation, form, and foundation.

23           You may go ahead and answer.

24           THE WITNESS:  In my experience, no.

52

1    keeper?

2        A.    Yes.

3        Q.    Your understanding of how the timestamping

4    works as indicated in this exhibit, is that based upon

5    your training and experience with the police

6    department?

7        A.    Yes.

8        Q.    I think you told me earlier you're one of the

9    individuals who train individuals how to use the

10   automated system, correct?

11       A.    Yes.

12       Q.    In that training that detention aides receive

13   prior to December 12, 2012, were they trained in the

14   use of handcuffs on individuals that appear to be

15   irrational and delusional?

16       A.    Yes, they are, yes.

17       Q.    And what training do they receive about the

18   use of handcuffs on individuals that are irrational

19   and delusional?

20       A.    I wasn't the instructor for that course.

21   It's during the tactical course that they learn

22   handcuffing techniques.

23       Q.    Did you receive training as a lockup keeper

24   in the proper use of handcuffs on individuals that

                                                        72

1   appear to be irrational and delusional?

2        A.   I received my handcuffing training when I was

3   in the police academy 23 years ago.

4        Q.   What is your understanding of the appropriate

5   use of handcuffs on individuals that appear to be

6   irrational and delusional?

7        A.   Handcuffs are only to be used to restrain a

8   person from harming themselves or someone else or if

9   they're being transported out to the hospital or to

10  court, that's the only time handcuffs are used.

11            They're not to be used in the cell or to

12  restrain someone while they're in the cell.  It's only

13  to keep them from harming themselves or someone else.

14       Q.   If an individual in the lockup is being

15  removed from the cell to be located to a different --

16  strike that.

17            If an arrestee is in their cell and they're

18  being removed from the cell, for example, to have

19  their photo taken or their fingerprints taken, their

20  handcuffs could be put on at that time for everybody's

21  safety?

22       A.   If the person presents -- is presenting to be

23  a harm to himself or someone else.  But to be -- only

24  if he or she is a threat to themselves or others.

                                                    73

1    Q.   If the person -- if the arrestee is perceived

2    by the lockup keeper or detention aide to be a

3    potential threat to themselves or others, they can put

4    handcuffs on them for the purpose of moving them out

5    of the cell to a different location?

6    A.   Yes.

7    Q.   Inside the lockup?

8    A.   Inside the lockup, but not in the cell.

9    Q.   Have you received any training on the proper

10   way to move an arrestee in a cell from -- strike that.

11        Have you received training on how to remove

12   an arrestee inside of a cell from inside their cell to

13   a different location within the lockup if they are

14   perceived to present a potential threat to themselves

15   or others?

16        MR. MOWATT:  I'm going to have to object to

17   the form.

18        But go ahead and answer if you can.

19        It looks like the deponent would like you to

20   rephrase your question.

21        MR. FOX:  Please tell me.

22        THE WITNESS:  Please rephrase it.

23   BY MR. FOX:

24   Q.   Have you ever received training that, if a

74

1    person appears to be irrational and delusional and

2    handcuffs are placed on them for safety purposes, that

3    it is within policy or procedure to pull them along

4    the floor by their handcuffs?

5            MR. MOWATT:  I'll object to the form.

6            But go ahead and answer.

7            THE WITNESS:  No.

8    BY MR. FOX:

9        Q.   We talked about this scenario a bit earlier,

10   but in a situation where an arrestee is verbally

11   refusing to leave their cell and a determination is

12   made that force of some kind needs to be used to

13   remove them from the cell, does a detention aide make

14   that decision or someone else?

15           MR. MOWATT:  I'm going to object to the

16   incomplete hypothetical.

17           But go ahead and answer.

18           THE WITNESS:  Can you rephrase that question?

19   I am trying to understand.

20   BY MR. FOX:

21       Q.   Sure.  It's not going to be about that

22   exhibit.

23       A.   I know.  I'm just holding it.

24           MR. MOWATT:  Do you mind if I take a shot at

                                                      75

# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

     PERCY COLEMAN, Administrator for     )
 4   the ESTATE OF PHILIP COLEMAN,        )
                                          )
 5                  Plaintiff,            )
                                          )
 6           vs.                          )
                                          )
 7   THE CITY OF CHICAGO, CHICAGO         )
     POLICE LIEUTENANTS MICHAEL RIGOLI,   ) No. 12 CV 10061
 8   STAR NO. 235, CARLOS MOSTEK, STAR    )
     NO. 196, and MICHAEL CASEY, STAR     )
 9   NO. 191, CHICAGO POLICE SERGEANTS    )
     SEAN TULLY, STAR NO. 1090, WILLIAM   )
10   MEADOR, STAR NO. 1003, and TOMMY     )
     WALKER, STAR NO. 2328, and CHICAGO   )
11   POLICE OFFICERS CORDY FOUCH, STAR    )
     NO. 19814, MARK JONES, STAR NO.      )
12   10390, DAVID MONTGOMERY, STAR NO.    )
     10651, BRIAN HOOD,                   )
13   STAR NO. 10598, REGINALD T.          )
     MALONE, STAR NO. 17484, and          )
14   DETENTION AIDE KEITH KIRKLAND,       )
                                          )
15                  Defendants.

16           The deposition of PONNI ARUNKUMAR, M.D.,

17   called by the Plaintiff for examination, taken pursuant

18   to notice and pursuant to the Federal Rules of Civil

19   Procedure for the United States District Courts

20   pertaining to the taking of depositions, taken before

21   Fran Barber, Certified Shorthand Reporter, Registered

22   Professional Reporter and Notary Public, at 2121 West

23   Harrison Street, Chicago, Illinois, commencing at

24   11:50 a.m. on the 19th day of May, 2014.
```



Coleman vs. City of Chicago
Ponni Arunkumar, M.D. - 05/19/2014                                    Page 75

1          A.    It is possible, yes.

2          MR. MARX:    I don't have any other questions.

3          MR. BROWNE:    A couple of follow-ups, real quick.

4                        REDIRECT EXAMINATION

5     BY MR. BROWNE:

6          Q.    Looking at photos that have been marked

7     City 4- -- 404.    The area that you circled there, that

8     is near the wrist area, is that correct?

9          A.    That is the back of his right -- sorry, back

10    of his left lower forearm.    So it is close to the wrist

11    area.    That's the ID tag there.

12         Q.    That's typically placed around their wrist

13    area?

14         A.    Yes.

15         Q.    Okay.    So it's just above that ID tag?

16         A.    Correct.

17         Q.    And there is an abrasion there?

18         A.    I call it -- there is an abrasion.    This is an

19    abrasion and then there are two bruises that I

20    documented.

21         Q.    Is that abrasion consistent with -- Strike

22    that.

23               Could that -- In your opinion, could that

24    abrasion have been caused by a handcuff?



Coleman vs. City of Chicago
Ponni Arunkumar, M.D. - 05/19/2014

Page 76

1       A.    It does not have a pattern but it can be

2   caused by it.

3       Q.    Okay.  Would you agree that's in the area

4   where handcuffs are typically placed?

5       A.    Correct.

6       Q.    Similarly, 40- -- City 406, you circled three

7   areas here.  In one of the areas, there is a -- First of

8   all, this photograph shows his right hand and forearm,

9   is that correct?

10      A.    That is correct.

11      Q.    And then of the three circles, the one in the

12  middle, that has an abrasion there, is that correct?

13      A.    Yes.

14      Q.    And is that in -- Would you agree that's in an

15  area where handcuffs are typically placed on

16  individuals?

17      MR. MARX:    Objection to foundation.

18          But you can answer to the extent you know.

19  BY THE WITNESS:

20      A.    It can be caused by the handcuffs placed.

21      Q.    So in your opinion, that abrasion could have

22  been caused by handcuffs?

23      MS. KUPE-ARION:    Objection to the form of the

24  question.



```
1    BY THE WITNESS:

2         A.    It could have been.  It's -- again, as I said,

3    slightly oblique, but it could have been.

4         Q.    407, City 407.  This is a photograph of his

5    left --

6         A.    Left.

7         Q.    -- wrist and forearm area, is that correct?

8         A.    That is correct.

9         Q.    And do you see an abrasion there in the wrist

10   area?

11        A.    Yes.

12        Q.    And could that have been caused by handcuffs?

13        A.    It is like --

14   MS. KUPE-ARION:  I'm sorry.

15             Objection to the form of the question.

16   Foundation, calls for speculation.

17   BY THE WITNESS:

18        A.    Yes.  It is an irregular abrasion but it

19   can -- could have been caused by a handcuff.  This one

20   (indicating) is a little more irregular than the one on

21   the other forearm but...

22        Q.    And then, during the break, you were nice

23   enough to get the parties your -- copies of your

24   examination diagram, is that correct?
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

# EXHIBIT E

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4                    - - -

5  PERCY COLEMAN, ADMINISTRATOR        )
   FOR THE ESTATE OF PHILIP COLEMAN,   )
6                                      )
              Plaintiff,               )
7                                      )
       vs.                             ) No.:  12 CV 10061
8                                      )
   THE CITY OF CHICAGO, CHICAGO POLICE )
9  LIEUTENANTS MICHAEL RIGOLI, STAR NO.)
   235, CARLOS MOSTEK, STAR NO. 196,   )
10 AND MICHAEL CASEY, STAR NO. 191,    )
   CHICAGO POLICE SERGEANTS SEAN TULLY,)
11 STAR NO. 1090, WILLIAM MEADOR,      )
   STAR NO. 1003, AND TOMMY WALKER,    )
12 STAR NO. 2328, AND CHICAGO POLICE   )
   OFFICERS CORDY FOUCH, STAR NO. 19814,)
13 MARK JONES, STAR NO. 10390, DAVID   )
   MONTGOMERY, STAR NO. 10651 BRIAN    )
14 HOOD, STAR NO. 10598, REGINALD T.   )
   MALONE, STAR NO. 17484, AND         )
15 DETENTION AIDE KEITH KIRKLAND,      )
                                       )
16            Defendants.              )
                                       )
17 _____)

18                  DEPOSITION OF

19             JEFFREY J. NOBLE, ESQ.

20              IRVINE, CALIFORNIA

21             SEPTEMBER 25, 2015

22 ATKINSON-BAKER, INC., COURT REPORTERS
   WWW.DEPO.COM
23 (800) 288-3376

24 REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

25 FILE NO:      A90A71D

1

1    Q.  Did you review the whole thing or did you just

2  view certain parts of it?

3    A.  No.  I reviewed parts of it.

4    Q.  Were you told what parts would be relevant to

5  look at?

6    A.  Yes.  I was given a list of parts and then I

7  skimmed through it, but you know, there was one section

8  of video that was like four hours and 40 minutes long.

9  And I didn't watch the entire tape, no.

10    Q.  I take it among the parts that you watched were

11  what was the cell extraction of Philip that happened at

12  the police station?

13    A.  Yes.

14    Q.  Did you watch the finger printing process with

15  him?

16    A.  Yes.

17    Q.  Did you watch the part where he had the mugshot

18  taken?

19    A.  Yes.

20    Q.  Did you watch the part where he was brought

21  into the police station?

22    A.  Yes.

23    Q.  Did you watch the part immediately after the

24  cell extraction where he's taken out and taken down the

25  hallway by Officer Kirkland?

1      A.   Yes.

2      Q.   Let's shift gears a little bit.

3           The report that you generated, does that report

4    contain all of your opinions in this case?

5      A.   Yes, with the exception of issues not regarding

6    the videos.  And I also received testimony of Al

7    Wysinger that I reviewed after completing the report,

8    W-y-s-i-n-g-e-r.

9      Q.   Who do you understand Al Wysinger to be?

10     A.   I know that I read that he's a member of the

11   command staff of the Chicago Police Department.

12     Q.   So, as a result of reviewing the video, did any

13   of your opinions change?

14     A.   No.  I don't think that anything changed.

15     Q.   As a result of reviewing the video, do you feel

16   like you have any additional opinions?

17          MR. GREEN:  Objection, speculation, vagueness,

18   but go on.

19          THE WITNESS:  Yeah, I'm not sure what you mean

20   by that.  Certainly, the video provided me some context

21   to the cell extraction and some other things.

22          Yeah, I don't know how else to answer that.

23   BY MR. FOX:

24     Q.   So, as a result of reviewing the testimony of

25   Wysinger, do you feel that you want to modify or

1        A.   My understanding is that the taser was

2    activated three times.

3        Q.   For how long each time?

4        A.   It seems like it was for the full five second

5    duration, but I'm not positive.

6        Q.   Would you agree that before a taser is used a

7    second time after it has been used the first time that

8    the officer using the taser should try to make an

9    assessment whether or not another shot with the taser is

10   appropriate and necessary?

11       A.   Yes.   That's how we train our officers, yes.

12       Q.   And that's true for each use of the taser, an

13   officer should make sure that it's reasonable and

14   appropriate before he uses the taser each time?

15       A.   Yes.

16       Q.   Now, so, after the -- after Mr. Coleman, you

17   realize that he was shackled and handcuffed inside the

18   cell; correct, when they were extracting him?

19       A.   Yes.

20       Q.   And then he was handcuffed with his hands in

21   front of him?

22       A.   Yes.

23       Q.   Okay.   Do you recall seeing anything in the

24   video how he was taken out of the cell and then down the

25   hallway?

1      A.   Yes.

2      Q.   Describe what you saw.

3      A.   His handcuffs were handcuffed in front of him.

4  An officer took his hands, pulled them up over his head

5  and dragged him out of the cell and down the hallway by

6  either holding his hand or middle part of the handcuffs

7  and dragged him down the hallway.

8      Q.   Now, in your opinion was it appropriate under

9  those circumstances to drag Mr. Coleman out of the cell

10 and then down the hallway like you saw in the video?

11     A.   No.

12     Q.   It was not appropriate?

13     A.   No.   It was not appropriate.

14     Q.   And why do you say that?

15     A.   Because they had sufficient officers there.

16 They were dragging him through the, you know, on the

17 ground through the lockup facility.   They had sufficient

18 people there to pick him up.

19          They should have either some, if you have, you

20 know, a person who, you know, is not complying either

21 because they can't or because they won't, most lockup

22 facilities either have chairs that they can lock

23 somebody down onto with wheels on them or they call the

24 paramedics and put him on a gurney.

25     Q.   And you observed officers actually carry

1   Mr. Coleman into the cell when he first arrived -- I'm

2   sorry.

3           You observed officers actually carry

4   Mr. Coleman into the jail when he first arrived at the

5   jail?

6       A.   Yes.

7       Q.   And something like that could been done as

8   well?

9       A.   Of course.

10          MR. FOX:   I'm about to head into a new topic.

11  Do you want to take a little bit of a break at this

12  point.

13

14              (At 12:00 p.m., the deposition of

15              JEFFREY J. NOBLE, ESQ., was

16              adjourned for the noon recess.)

17  ///

18              (At 12:45 p.m., the deposition of

19              JEFFREY J. NOBLE, ESQ., was

20              reconvened from the noon recess.)

21

22  BY MR. FOX:

23      Q.   Back on the record.

24          So, we've just marked as Exhibit 8 another

25  policy, it's the crisis intervention team C.I.T.

93

select group of independent policy advisors and academics. The project was an effort to develop national best practices in the area of internal investigations for police agencies. I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct. As a result of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

d.     I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

e.     In 2013, I gave a presentation in Mexico and the request of the Mexican government on preventing corruption in police institutions.

r.     I have published 21 articles on policing including the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures. Those articles are listed in my attached resume.

g.     I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

h.     As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

6.     My experience, training and background are more fully described in my attached resume.

7.     My areas of expertise in policing include but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.     I reviewed the following material in making my opinions:

- Fourth Amended Complaint
- City's Answer of Fourth Amended Complaint

3

- Brasfield Expert Report
- Deposition of Joshua Hunt
    - o Exhibits
        - Exhibit 1 – Notice of Rule 30(B)(6)
        - Exhibit 2 – IPRA Annual Report 2010-2012
        - Exhibit 3 – General Order G08-01 Complaint and Disciplinary Procedures
        - Exhibit 4 – Special Order S08-01-01 Conduct of Complaint Investigations
        - Exhibit 5 – IPRA Chapter 2-57
- The Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System" Craig B. Futterman (2008)
- DOJ Report 06-006 Citizen Complaints About Police Use of Force
- City's Supplemental Responses to Plaintiff's Request for Admissions No. 21 and 22
- City's Supplemental Reponses to Plaintiff's Request for Admissions
- City's Verified Answers to Plaintiff's First Set of Interrogatories
- City's Responses to Plaintiff's Requests for Admissions
- City's Responses to Plaintiff's First Set of Document Production Requests
- City's Answers to Plaintiff's Second Set of Interrogatories
- City's Answers to Plaintiff's Third Set of Interrogatories
- City's Supplemental Responses to Plaintiff's First Set of Document Production Requests
- Sampling Stipulations
- City's Supplemental Answers to Plaintiff's First Set of Interrogatories
- Expert Report of Paul E. Keck, MD
- Spreadsheet – All Liable Chicago Police Matters
- Expert Report of Joel Silberberg, MD
- Spreadsheet – Sampling Pool Arrest Breakdown
- Myths and Mechanics of Deterrence: The Role of Lawsuits in Law Enforcement Decision Making by Joanna C. Schwartz, UCLA Law Review 2010.
- Depositions
    - o Jon Blakley
    - o Mark Bowen
    - o Aaron Buckley
        - Exhibits
            - #1 - Chicago Fire Department incident report – Jane Delisle
            - #2 - Chicago Fire Department incident report – Sean Tully
    - o Lee Caldwell
        - Exhibits
            - #1 - Arrest Report – Philip Coleman
    - o Jacqueline Coleman

- Exhibits
  - #1 - Photograph of Lena Coleman's injuries
  - #4 - email to newscenter five
  - #5 - email to John Kass
  - #6 - email to newscenter five
- Percy Coleman
  - Exhibits
    - #1 - Third Amended Complaint
    - #2 - Photograph of bathroom window
    - #3 – IPRA statement of Percy Coleman
    - #4 – Diploma of Philip Coleman
    - #5 – Diploma of Philip Coleman
    - #6 – Vitas brochure
    - #7 – Family photograph
    - #8 – Rainbow Push Coalition in memoriam of Philip Coleman
    - #9 – email to Jeremiah Wright
    - #10 – Football team photograph
    - #11 – N'Digo cover photograph
    - #12 – Family photograph
    - #13 – Umoja-One press release
    - #14 - email to news Channel 5
    - #15 - email to John Kass
- Luke Connolly
  - Exhibits
    - #1 - Supplemental report
    - #2- Detective Connolly business card
    - #3 - Photograph of cell
    - #4 - Photograph of cell
    - #5 - Photograph of cell
    - #6 - Photograph of lockup
    - #7 - Photograph of lockup
    - #8 - Photograph of lockup
    - #9 - Photograph of lockup
    - #10 - Photograph of lockup
    - #11 - Photograph of lockup
- John Craig, Jr.
- Nicole Creamer
  - Exhibits
    - #1 - Diagram of emergency room
- Theresa Davis
- James Delisle

5

- ▪ Exhibits
  - #1 - Officer's Battery Report
  - #2 - Tactical Response Report
  - #3 - Report of exposure to communicable disease/hazardous material
  - #4 - Injury on duty report
  - #5 - Photograph of Officer Delisle showing blood on T-shirt and shirt collar
  - #6 - Photograph of Officer Delisle
- o Clyde A. White
- o Dr. Larry Mitchell
- o Charita Edwards
  - ▪ Exhibits
    - #1 - Original Case Incident Report
- o Mohreyah Fawbush
- o Cordy Fouch
  - ▪ Exhibits
    - #1 - Taser report
    - #2 - Officer's Battery Report
    - #3 - Tactical Response Report
    - #4 - Photograph of lockup
    - #5 – Photograph
    - #6 - Photograph
- o Wanda Graves
- o Bufort Hart
  - ▪ Exhibits
    - #1 – Subpoena
    - #2 - Chicago Fire Department incident report
    - #3 – IPRA statement of Bufort Hart
    - #4 – EMS Instant Case Report
- o Joshua Hunt
- o Chris Jackson
- o Phoebe Jackson
- o Dr. Carlito Javier
  - ▪ Exhibits
    - #1 - Diagram of emergency room
    - #2 - Medical report – Philip Coleman
- o Mark Jones
  - ▪ Exhibits
    - #1 – Officer's Battery Report
- o Cedric Jordan
  - ▪ Exhibits
    - #1 - Chicago Fire Department report – Philip Coleman

- #2 – IPRA statement Cedric Jordan
- #3 – EMS Instant Case Report
- Keith Kirkland
  - Exhibits
    - #1 - Arrest Report
    - #2 - Tactical Response Report - Kirkland
- Melissa Knazze
  - Exhibits
    - #1 – IPRA memorandum - Visit to Fifth District – Conversation with CPD
    - #2 – IPRA memorandum – Additional Information
    - #3 – IPRA memorandum – Visit to Roseland Hospital – Hippa Form
    - #4 – IPRA memorandum – Summary of Visit to Roseland Hospital
    - #5 - Handwritten Notes
- Terrance Lein
  - Exhibits
    - #1 - Chicago Fire Department Unofficial Incident Report
    - #2 - Chicago Fire Department report – Philip Coleman
    - #3 - Photograph inside lockup
- Lena Coleman
  - Exhibits
    - #1 - Photograph of interior of residence
    - #2 – Photograph of interior of residence
    - #3 – Photograph of interior of residence
    - #4 – Photograph of interior of residence
    - #5 – Photograph of interior of residence
    - #6 – Photograph of interior of residence
    - #7 – Photograph of interior of residence
    - #8 – Photograph of interior of residence
    - #9 – Photograph of interior of residence
    - #10 – Photograph of interior of residence
    - #11 – Photograph of interior of residence
    - #12 – Photograph of interior of residence
    - #13 – Photograph of interior of residence
    - #14 – Photograph of exterior of residence
    - #15 – Photograph of exterior of residence
    - #16 – Photograph of injury
    - #17 – Photographs of injuries
    - #18 – Photographs of injuries
    - #19 – Photographs of injuries

7

- Reginald Malone
  - Exhibits
    - #1 - Tactical Response Report – Malone
    - #2 – Officer's Battery Report
- William Meador
  - Exhibits
    - #2 - Officer's Battery Report
    - #3 - Tactical Response Report - Meador
    - #4 - Tactical Response Report - Baader
    - #5 - Tactical Response Report – Montgomery
    - #6 - Tactical Response Report – Hill
    - #7 - Original Case Incident Report
- Carlos Mostek
  - Exhibits
    - #1 - Tactical Response Report – Baader
    - #2 - Officer's Battery Report
- Somi Nagaraj
- Tonya Pye
  - Exhibits
    - #1 - Notice of Rule 30(B)(6) Deposition
    - #2 - Guidelines for Arrestee Screening and Monitoring
    - #3 - General Order G06-01-01 - Field Arrest Procedures
    - #4 - Special Order S06-01 - Processing Persons
    - #5 – Special Order S06-01-02 - Detention Facilities General Procedures and Responsibilities
    - #6 - Special Order S04-20-01 - Handling Arrestees in Need of Mental Treatment
    - #7 - Special Order S04-20 - Handling Persons in Need of Mental Treatment
    - #8 - Special Order S06-07 - Hospitalized Arrestees
    - #9 - Special Order S04-20-04 - Mental Health Transport and Related Duties Matrix
    - #10 - Special Order S06-08 - Approved Medical Facilities
    - #11 - Arrest Report
    - #12 - Photograph of lockup
    - #13 - Photograph of lockup
    - #14 - Photograph of lockup
- Michael Rigoli
  - Exhibits
    - #1 - Tactical Response Report – Delisle
    - #2 - Tactical Response Report – Tully
    - #3 - Arrest Report - Philip Coleman
    - #4 - Original Case Incident Report

- #5 - Photograph inside lockup
- #6 - Photograph inside lockup
- #7 - Photograph inside lockup
- #8 - Photograph inside lockup
- #9 - Photograph inside lockup
- #10 - Photograph inside lockup
- #11 - Photograph inside lockup
- #12 - Photograph inside lockup
- #13 - Photograph inside lockup
  - Larry Snellin
  - Deborah Weston
  - Terrance White
  - Tanya Wilson
  - Tommy Walker
  - Paul Gerard
- Officer Histories
  - Lieutenant Casey
  - Cordy Fouch
  - Brian Hood
  - Mark Jones
  - Keith Kirkland
  - Reginald Malone
  - William Meador
  - David Montgomery
  - Carlos Mostek
  - Michael Rigoli
  - Sean Tully
  - Tommy Walker
- General City Documents
  - City (00001-00018) - Area Detective File
  - City (00018-00030) - Arrest Reports
  - City (00030-00063) - Area Detective File
  - City (00064-00067) - Supplemental Report
  - City (00068-00089) - Tactical Response Report
  - City (00090-00098) - Tactical Response Report
  - City (00099) - Criminal History, Philip Coleman
  - City (00100) - Fingerprints
  - City (00101-00108) - General Order G06-01-01, Field Arrest Procedures
  - City (00109-00112) - General Order G08-01-02, Specific Responsibilities Regarding Allegations of Misconduct
  - City (00113) - Lockup log
  - City (00114) - Mug shots
  - City (00115-00139) – OMEC Event Queries Log

- City (00140-00142) - Special Order S04-20-01, Handling Arrestees in Need of Mental Treatment
- City (00143-00144) - Special Order S08-01-01, Conduct of Complaint Investigations
- City (00145-00150) - Special Order S08-01-01, Conduct of Complaint Investigations
- City (00151-00157) - Watch Incident Log
- City (00158-00162) - Inventory Item Inquiry
- City (00163-00168) - Inventory Item Inquiry
- City (00169-00189) - Medical Examiner Report
- City (00190-00212) – OEMC records
- City (00213) - Philip Coleman coverage
- City (00214-00301) - Photographs
- City (00302-00333) – Photographs
- City (00334-00343) - Taser reports
- City (00344-00361) – Chicago Fire Department Reports
- City (00362-00363) - Forms Retention Schedule
- City (00364-00367) - General Order G08—01, Complaint and Disciplinary Procedures
- City (00368-00374) - General Order G09-01-01, Access to Computerize Data, Dissemination and Retention of Computer Data
- City (00375-00378) - Special Order S11-03-01, Annual Prescribed Weapon Qualification Program and Taser Recertification
- City (00379-00382) –  Policy U04-02-04, Taser Devices
- City (00383-00386) - Department Forms
- City (00387) - Copy of DVD
- City (00388-00390) – Copy of DVDs
- City (00391-00446) - Medical Examiner Photographs
- City (00447-00485) – OEMC Retention Schedule
- City (00486-00898) - Log part one
- City (00899-01380) - Log part two
- City (01381-01383) – Copy of CD
- City (01384-01440) -General Order 02-03, Processing Persons Under Department Control
- City (01441-01459) - General Order G06-01, Processing Persons Under Department Control
- City (01460-01463) - General Order 91-3, Hospitalized Arrestees
- City (01464-01469) - Special Order 03-15, Approved Medical Facilities
- City (01470-01477) - Special Order 03-15 (7/29/04) Approved Medical Facilities
- City (01478-01493) - Special Order 04-06, Handling Persons in Need of Mental Treatment
- City (01494-01496) - Special Order S04-20-01, Handling Arrestees in Need of Mental Treatment

10

- o City (01497-01548) - Special Order S06-01, Processing Persons Under to Department Control
- o City (01549-01554) -Special Order S06-07, Hospitalized Arrestees
- o City (01555-01562) - Special Order S06-08, Approved Medical Facilities
- o City (01563-01570) - Special Order S06-08, Approved Medical Facilities
- o City (01571-01578) - Special Order S06-08, Approved Medical Facilities
- o City (01579-01582) - All Liable Chicago Police Matters (12/12/07 – 12/12/12)
- o City (01583-01593) - General Order 91-3, Hospitalized Arrestees (2/19/91)
- o City (01594-01649) - General Orders
- o City (01650-01710) - General Orders
- o City (01711-01960) - General Orders
- o City (01961-01962) - General Order 02-03-05B, Lockup Personnel and Detention Facilities – General Procedures
- o City (01963-01964) - Guidelines for Arrestee Screening and Monitoring
- o City (01965-01967) - Special Order S06-01-02, Detention Facilities General Procedures and Responsibilities
- o City (043734-044269) – CPD Training Manuals (Mental Health, CIT)
- o City (044271-044703) - Taser Training Materials
- City (042355-042381) Taser X2 Certification Lesson Plan Version 18
- City (042382-042401) Taser X2 Upgrade Certification Lesson Plan Version 18
- City (042402-042635)Taser X2 User Version 19
- City (042636-043012) Dealing with Variant Behavior training materials
- City (016244-016949) Office of Professional Standards – Standard Operating Procedures Manual
- Coleman (000430-000437) Bureau of Internal Affairs 2012 Year End Review
- Coleman (000438-000479) 2010 - 2012 Annual Report Police Board
- Coleman (000480-000536) 2004 – 2009 Annual Report Police Board
- City (015917-016243) IPRA Investigation
- Deposition of Michael Brasfield
  - o Exhibits
    - ▪ 1 – Notice of Deposition
    - ▪ 2 – Resume
    - ▪ 3 – Court Experience
    - ▪ 4 – Fee Schedule
    - ▪ 5 – Material Reviewed
    - ▪ 6 – Report
    - ▪ 7 – Analysis of Arrestee Information
    - ▪ 8 – Spreadsheet Arrestees
    - ▪ 9 – Arrestees identified with mental health issues
    - ▪ 10 – Review of CRs involving self-harm
    - ▪ 11 – Summary of Evidence Civil Findings

11

# EXHIBIT F

Coleman vs. City of Chicago
Sergeant William Meador - 01/31/2014

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

    PERCY COLEMAN, Administrator for     )
4   the Estate of Philip Coleman,        )
                                         )
5                  Plaintiff,            )
                                         )
6          vs.                           )No. 12 CV 10061
                                         )
7   THE CITY OF CHICAGO, Chicago         )
    Police Lieutenants MICHAEL RIGOLI,   )
8   Star No. 235, CARLOS MOSTEK,         )
    Star No. 196, and MICHAEL CASEY,     )
9   Star No. 191, Chicago Police         )
    Sergeants SEAN TULLY, Star No.       )
10  1090, WILLIAM MEADOR, Star No.       )
    1003, and TOMMY WALKER, Star No.     )
11  2328, and Chicago Police Officers    )
    CORDY POUCH, Star No. 19814, MARK    )
12  JONES, Star No. 10390, DAVID         )
    MONTGOMERY, Star No. 10651           )
13  BRIAN HOOD, Star No. 10598,          )
    REGINALD T. MALONE, Star No. 17484,  )
14  and Detention Aide KEITH KIRKLAND,   )
                                         )
15                 Defendants.           )
                                         )
16

17          The deposition of SERGEANT WILLIAM MEADOR,
    called by the Plaintiff for examination, taken pursuant
18  to notice and pursuant to the Federal Rules of Civil
    Procedure for the United States District Courts
19  pertaining to the taking of depositions, taken before
    Kristen Scapardine, Certified Shorthand Reporter,
20  Registered Professional Reporter, and Notary Public, at
    300 West Adams Street, Suite 330, Chicago, Illinois,
21  commencing at 2:00 p.m. on January 31, 2014.

22

23

24
```



Coleman vs. City of Chicago
Sergeant William Meador - 01/31/2014                                    Page 53

```
1    we wanted to get him where we had more room if we needed

2    to control the situation more.

3         Q.   Was he refusing to walk after he was

4    handcuffed and shackled?

5         A.   Yes.

6         Q.   What was he doing to refuse to work?

7         A.   Just deadweight.  I would call it a passive

8    resistance.

9         Q.   So because of that, he was pulled out by his

10   cuffs?

11        A.   I don't remember what he was pulled out by.

12        Q.   But because he was deadweight, he was pulled

13   out?

14        A.   Pulled out of the cell.

15        Q.   And that was because of his deadweight?

16        A.   Yeah.  I mean, the objective was still to get

17   him to court.

18        Q.   Now, what else did you hear Coleman saying

19   while the struggle was going on to get him handcuffed?

20        A.   I don't remember what he was saying while the

21   struggle was going on.  Like I said, I was focusing on

22   the physical aspects of it.

23        Q.   After he was cuffed, what do you remember him

24   saying?
```



Coleman vs. City of Chicago
Sergeant William Meador - 01/31/2014

Page 57

```
 1        A.    No.
 2        Q.    And were you present when the paramedics were
 3   there dealing with Mr. Coleman?
 4        A.    Yes.
 5        Q.    And did you hear the paramedics ask
 6   Mr. Coleman any questions?
 7        A.    I can't remember if they asked him questions
 8   or not.
 9        Q.    They took his vitals?
10        A.    Yes.
11        Q.    Well, do you remember paramedics asking him
12   anything to the effect of, you know, does anything hurt,
13   anything like that?
14        A.    I can't remember if there were any specific
15   questions asked.  I'm sure there were, you know.
16        Q.    Do you remember any responses to anything that
17   the paramedics -- by Coleman to anything that the
18   paramedics were saying?
19        A.    No.  Uh-uh.  I don't.
20        Q.    So when you guys were in the hallway while
21   Mr. Coleman was being pulled into -- being pulled out of
22   the hall -- being pulled out of the cell and down the
23   hall, did anything happen that was funny or amusing that
24   caused other officers to laugh?
```



Coleman vs. City of Chicago
Sergeant William Meador - 01/31/2014

Page 58

1      A.    No.

2      Q.    And so do you remember yourself smiling about

3   anything?

4      A.    I do.

5      Q.    And what was that?

6      A.    It was a way of decompressing.

7      Q.    And you were decompressing because you just

8   had this incident where you had to subdue a combative

9   suspect or combative arrestee?

10     A.    Yes.

11     Q.    And that was stressful; is that right?

12     A.    Oh, yes.

13     Q.    Did any officer in your presence while the

14  paramedics were there ask Coleman anything about why he

15  was being so combative?

16     A.    No, not that I remember.

17     Q.    So --

18     THE WITNESS:  Can I ask you a question real quick

19  about that?

20     MS. MARTIN:  Sure.

21     THE WITNESS:  This --

22     MS. MARTIN:  Wait.  Wait.  Not in front of them.

23               (Discussion off the record.)

24



# EXHIBIT G

Coleman vs. City of Chicago
Mark Jones - 01/13/2014

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3

    Percy Coleman, Administrator for )
 4  the Estate of Philip Coleman,     )
                                      )
 5               Plaintiff,           )
                                      )
 6          vs.                       )   NO. 12 CV 10061
                                      )
 7  The City of Chicago, Chicago      )
    Police Lieutenants Michael        )
 8  Rigoli, Star No. 235, Carlos      )
    Mostek, Star No. 196, and         )
 9  Michael Casey, Star No. 191,      )
    Chicago Police Sergeants Sean     )
10  Tully, Star No. 1090, William     )
    Meador, Star No. 1003, and        )
11  Tommy Walker, Star No. 2328, and  )
    Chicago Police Officers Cordy     )
12  Fouch, Star No. 19814, Mark       )
    Jones, Star No. 10390, David      )
13  Montgomery, Star No. 10651,       )
    Brian Hood, Star No. 10598,       )
14  Reginald T. Malone, Star          )
    No. 17484, and Detention Aide     )
15  Keith Kirkland,                   )
                                      )
16               Defendants.          )

17

18            The deposition of MARK JONES, called by the
    Plaintiff for examination, taken pursuant to notice
19  and pursuant to the Federal Rules of Civil Procedure
    for the United States District Courts pertaining to
20  the taking of depositions, taken before Cheryl R.
    Cicero, Certified Shorthand Reporter, at 300 West
21  Adams Street, Suite 330, Chicago, Illinois, commencing
    at 12:10 p.m. on the 13th day of January, A.D., 2014.

22

23

24
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com



Coleman vs. City of Chicago
Mark Jones - 01/13/2014                                          Page 30

```
 1    grab a hold of him at that point?

 2         A.  I don't recall.

 3         Q.  Okay.  Did any officer say anything in

 4    response to that?

 5         A.  No.

 6         Q.  Did any officer try to put him in an escort

 7    hold or an armbar or wristlock hold?

 8         A.  No, not at the time.

 9         Q.  Okay.  So what was the next thing that

10    happened after he took this aggressive stance?

11         A.  At that point Officer Fouch was given an

12    order to deploy the Taser.

13         Q.  And who gave him that order?

14         A.  Sergeant Walker.

15         Q.  Okay.  So when he deployed the Taser did it

16    appear to you that it had an effect on Coleman?

17         A.  I couldn't tell.

18         Q.  How did he respond to being tased?

19         A.  His body seemed to go limp.  Couldn't really

20    tell.

21         Q.  Pardon?

22         A.  His body went limp.

23         Q.  Well, when somebody is tased, isn't that

24    typically what happens is somebody's body goes limp?
```



Coleman vs. City of Chicago
Mark Jones - 01/13/2014

Page 31

1          A.   Well, no.

2          Q.   What is your experience of what happens?

3          A.   Well, the person tased, there's normally a

4   reaction in the body, a nerve-type of reaction.  I

5   didn't observe that with Mr. Coleman.

6          Q.   When you say, "A nerve-type of reaction,"

7   like a shaking?

8          A.   Like a shaking or --

9          Q.   But shaking being --

10         A.   Yes.

11         Q.   -- a shaking movement?

12         A.   Movement.

13         Q.   Okay.  You don't want to use convulsions, but

14   it's almost like --

15         A.   Similar to that.

16         Q.   All right.  And Mr. Coleman didn't do that?

17         A.   No.

18         Q.   Did he remain standing, or did he go down or

19   what?

20         A.   He went down back to the bench.

21         Q.   All right.  So after he was tased and he went

22   down to the bench, what was the next thing that

23   happened?

24         A.   The next thing that happened was the officers



Coleman vs. City of Chicago
Mark Jones - 01/13/2014                                    Page 32

```
 1    rushed in to joint handcuff him.

 2         Q.   And describe how that proceeded.

 3         A.   I can't speak about what the officers did, I

 4    can only say what I did.

 5         Q.   Okay.  Go ahead.

 6         A.   I had a pair of cuffs, and I tried to place

 7    the cuffs on Mr. Coleman.

 8         Q.   And describe how that proceeded.

 9         A.   It was hard to do.

10         Q.   Okay.

11         A.   He was still resisting, it was hard to get

12    the cuffs on him.

13         Q.   What was he doing to resist when you were

14    trying to do that?

15         A.   He was moving his legs.

16         Q.   Okay.  And several of the officers were on

17    top of Mr. Coleman at that point?

18         MS. MARTIN:   Objection to the form of the

19    question, foundation.

20    BY THE WITNESS:

21         A.   I don't understand the question.

22         Q.   Okay.  Well, when you went to try to put the

23    cuffs on Mr. Coleman, you were having -- Other

24    officers were assisting you in subduing Mr. Coleman?
```



Coleman vs. City of Chicago
Mark Jones - 01/13/2014

1          A.   That's correct.

2          Q.   And when you say he was trying to move his

3   legs, was he -- Did it appear to you that he was

4   trying to kick somebody?

5          A.   No.

6          Q.   Okay.  Did he, in fact, kick somebody that

7   you saw?

8          A.   Not that I'm aware of.

9          Q.   And then with his hands did he try to take a

10  swing at you?

11         A.   No.

12         Q.   All right.  And so I take it you were

13  grabbing his hands to handcuff them?

14         A.   No.  Actually, I was trying to get his legs

15  so I could put leg shackles on him.

16         Q.   Okay.

17         A.   I didn't touch his hands.

18         Q.   And somebody else had handcuffs for his

19  hands?

20         A.   Yes.

21         Q.   And who was that?

22         A.   I don't remember who it was that had cuffs

23  out at the time.

24         Q.   Were you successful in getting leg shackles

JENSEN
Litigation Solutions

# EXHIBIT H

Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
     Percy Coleman, Administrator for )
 4   the Estate of Philip Coleman,     )
                                       )
 5                       Plaintiff,    )
                                       )
 6            vs.                      )   NO. 12 CV 10061
                                       )
 7   The City of Chicago, Chicago      )
     Police Lieutenants Michael        )
 8   Rigoli, Star No. 235, Carlos      )
     Mostek, Star No. 196, and         )
 9   Michael Casey, Star No. 191,      )
     Chicago Police Sergeants Sean     )
10   Tully, Star No. 1090, William     )
     Meador, Star No. 1003, and        )
11   Tommy Walker, Star No. 2328, and  )
     Chicago Police Officers Cordy     )
12   Fouch, Star No. 19814, Mark       )
     Jones, Star No. 10390, David      )
13   Montgomery, Star No. 10651,       )
     Brian Hood, Star No. 10598,       )
14   Reginald T. Malone, Star          )
     No. 17484, and Detention Aide     )
15   Keith Kirkland,                   )
                                       )
16                       Defendants.   )

17

18           The deposition of REGINALD MALONE, called by
     the Plaintiff for examination, taken pursuant to
19   notice and pursuant to the Federal Rules of Civil
     Procedure for the United States District Courts
20   pertaining to the taking of depositions, taken before
     Cheryl R. Cicero, Certified Shorthand Reporter, at
21   300 West Adams Street, Suite 330, Chicago, Illinois,
     commencing at 12:00 p.m. on the 22nd day of January,
22   A.D., 2014.

23

24
```



Litigation Solutions

Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

Page 35

```
 1    Meador -- Fouch, Jones, Sergeant Meador,
 2    Sergeant Walker and myself.  That's about it.
 3         Q.  Okay.  So that's six guys you named including
 4    yourself?
 5         A.  I believe it was six, yes.
 6         Q.  Okay.  So before any of you entered the
 7    cell -- Eventually, you entered the cell, correct?
 8         A.  Yes.
 9         Q.  Okay.  Before that happened did
10    Sergeant Walker or anybody discuss with you officers a
11    plan of action of how you were going to go about
12    dealing with the situation?
13         A.  Well --
14         MS. MARTIN:  Listen to the question.  Discuss a
15    plan of action.
16    BY THE WITNESS:
17         A.  The plan of action was to get him out of his
18    cell.
19         Q.  Did Sergeant Walker discuss with anybody
20    having a Taser ready, a Taser gun ready?
21         A.  Not to my knowledge.
22         Q.  Do you know if anybody had a Taser
23    available?
24         A.  I observed a Taser, yes.
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

Page 45

```
 1            Q.   Okay.  And during the course of the
 2    take-down, how long did it take you to get him cuffed
 3    and shackled, roughly?
 4            A.   Maybe 20 seconds.
 5            Q.   All right.  In the course of doing that,
 6    Coleman didn't strike you, did he?
 7            A.   No.
 8            Q.   And he didn't kick you, did he?
 9            A.   No.
10            Q.   He didn't spit on you, did he?
11            A.   I believe at that time he was doing some type
12    of spitting.
13            Q.   What type of spitting was he doing at that
14    time?
15            A.   Just, like spitting.
16            Q.   Did you get hit with any spit?
17            A.   No.
18            Q.   Do you know of any officer that got hit with
19    any spit?
20            A.   No.
21            Q.   You said you believe he was doing some
22    spitting at that time.  Did you actually see him
23    spit?
24            A.   Well, yes, spit, slob, uh-huh.
```



Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

1   Q. He had slob around his mouth; is that what

2 you're saying?

3   A. A little bit, yes.

4   Q. Okay. Did any officer tell you that they

5 were spit on by Coleman?

6   A. Not at that time, no.

7   Q. At any time?

8   A. No.

9   Q. Did you actually see Coleman spit out of his

10 mouth?

11   A. Yes.

12   Q. And when he did it, in whose direction did he

13 do it towards?

14   A. It wasn't as if he was spitting, he was

15 just -- spitting. He wasn't directing it towards

16 anyone.

17   Q. All right. I guess I'm not quite

18 understanding. You said it wasn't as if he was

19 spitting, he was spitting so I'm not --

20   A. I mean, he wasn't directing, like, I'm going

21 to spit on you. You know, it wasn't that.

22   Q. Okay. So it appeared to be unintentional

23 from what you observed?

24   A. I don't know if it was intentional or not.



Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

Page 49

```
 1        A.   He was pulled, yes.

 2        Q.   Okay.   By his handcuffs?

 3        A.   I don't know exactly where he had grabbed

 4   him.

 5        Q.   Did you observe him being pulled?

 6        A.   Yes.

 7        Q.   Okay.   And did it appear that Coleman was not

 8   walking under his own power at that point?

 9        A.   No, he could walk.

10        Q.   Okay.

11        A.   He could have walked.

12        Q.   Why do you say that?

13        MS. MARTIN:   You know what, that wasn't the

14   question.

15        THE WITNESS:   I'm sorry.

16   BY MR. FOX:

17        Q.   Nevertheless, why do you say he could have

18   walked?

19        A.   Because he could have walked.

20        Q.   Okay.   Are you saying he had the opportunity

21   to walk; is that what you're saying?

22        A.   Yes, he could have walked.   Yes.

23        Q.   And when you say he could have walked, do you

24   mean if he had decided he wanted to walk he could have
```



Coleman vs. City of Chicago
Reginald Malone - 01/22/2014

Page 50

1    walked?

2         A.   Yes.

3         Q.   And did it appear that he did not want to

4    walk?

5         A.   He was refusing.

6         Q.   And how was he making his refusal to walk

7    known?

8         A.   Just not by following verbal commands.

9         Q.   And who was giving him verbal commands?

10        A.   Sergeant Walker.

11        Q.   And what was Walker telling him?

12        A.   That was inside of his cell, to get up and,

13   you know, and go so you can be transported.

14        Q.   Okay.  And it's your testimony he wasn't

15   getting up?

16        A.   He wasn't following directions, no.

17        Q.   Okay.  So then he was pulled from the cell by

18   Detention Aide Kirkland?

19        A.   Yes.

20        Q.   Is there any reason he wasn't carried as

21   opposed to being pulled, as you've described it?

22        A.   No.

23        Q.   Okay.  Up to the time that Coleman left,

24   exited the cell, did you hear him say anything?



# EXHIBIT I

```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      Percy Coleman, Administrator for )
 4    the Estate of Philip Coleman,    )
                                       )
 5                     Plaintiff,      )
                                       )
 6            vs.                      )   NO. 12 CV 10061
                                       )
 7    The City of Chicago, Chicago     )
      Police Lieutenants Michael       )
 8    Rigoli, Star No. 235, Carlos     )
      Mostek, Star No. 196, and        )
 9    Michael Casey, Star No. 191,     )
      Chicago Police Sergeants Sean    )
10    Tully, Star No. 1090, William    )
      Meador, Star No. 1003, and       )
11    Tommy Walker, Star No. 2328, and )
      Chicago Police Officers Cordy    )
12    Fouch, Star No. 19814, Mark      )
      Jones, Star No. 10390, David     )
13    Montgomery, Star No. 10651,      )
      Brian Hood, Star No. 10598,      )
14    Reginald T. Malone, Star         )
      No. 17484, and Detention Aide    )
15    Keith Kirkland,                  )
                                       )
16                     Defendants.     )

17

18            The deposition of CORDY FOUCH, called by the
      Plaintiff for examination, taken pursuant to notice
19    and pursuant to the Federal Rules of Civil Procedure
      for the United States District Courts pertaining to
20    the taking of depositions, taken before Cheryl R.
      Cicero, Certified Shorthand Reporter, at 300 West
21    Adams Street, Suite 330, Chicago, Illinois, commencing
      at 10:00 a.m. on the 13th day of January, A.D., 2014.

22

23

24
```



Coleman vs. City of Chicago
Cordy Fouch - 01/13/2014

Page 25

1      A.   I can't recall which court it was.

2      Q.   And on this particular day was it your

3  understanding you were taking just Mr. Coleman, Philip

4  Coleman, to court, or were there other prisoners you

5  would be taking to court?

6      A.   I'm pretty sure there were other prisoners.

7      Q.   But you don't remember that for sure?

8      A.   No.

9      Q.   So when Sergeant Walker told you that he was

10  refusing to go to court, he told you he wanted you to

11  assist with getting him to court; is that correct?

12     A.   Yes.

13     Q.   And did you discuss some sort of plan of

14  action with anyone before you arrived at Coleman's

15  cell?

16     A.   Yes, with Sergeant Walker.

17     Q.   I'm sorry?

18     A.   With Sergeant Walker.

19     Q.   Okay.  What was the plan of action you

20  discussed with Sergeant Walker?

21     A.   To try to get him to court.

22     Q.   Did you discuss with Sergeant Walker before

23  you entered Philip Coleman's cell, did you discuss any

24  kind of action of how you would go about doing that?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Cordy Fouch - 01/13/2014

Page 26

```
 1        A.   No.

 2        Q.   So in addition to yourself, who else was

 3   present at Coleman's cell before you entered Coleman's

 4   cell that morning?

 5        A.   Myself, Officer Jones, Officer Malone,

 6   Sergeant Walker, Sergeant Meador, and

 7   Keith Kirkland.

 8        Q.   And are any of these fellows you just named,

 9   are any of them supervisors?

10        A.   Sergeant Walker and Sergeant Meador.

11        Q.   And what is -- Meador is a sergeant then I

12   take it?

13        A.   Yes.

14        Q.   All right.  And can you describe Sergeant

15   Meador; white, black?

16        A.   Caucasian.

17        Q.   Okay.  And he's roughly how tall?

18        A.   5'6", 5'7".

19        Q.   Medium build?

20        A.   5'7", kind of thin.

21        Q.   Okay.  And was it, in fact, the first time

22   you saw Coleman, he was in his cell?

23        A.   Yes.

24        Q.   Okay.  Now, before you entered Coleman's cell
```


JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Cordy Fouch - 01/13/2014

Page 56

```
 1          A.   I can't -- Rephrase the question.

 2          Q.   Sure.

 3          A.   I don't understand the question.

 4          Q.   After Mr. Coleman was present were you

 5   present during any discussion about where Mr. Coleman

 6   was going to go from the jail?

 7          A.   Was this before the incident or after the

 8   incident?

 9          Q.   After he was handcuffed.

10          A.   He was going to the hospital.

11          Q.   And do you recall the paramedics being

12   called?

13          A.   Yes.

14          Q.   And do you know why the paramedics were

15   called?

16          A.   To take him to the hospital to get the probes

17   out.

18          Q.   And were you present when the paramedics

19   arrived?

20          A.   Yes.

21          Q.   Do you recall if Mr. Coleman appeared to be

22   conscious or unconscious at that time?  Just from your

23   opinion based on what you observed.

24          A.   I believe he was conscious.
```


JENSEN
Litigation Solutions

Coleman vs. City of Chicago
Cordy Fouch - 01/13/2014

Page 57

1      Q.   Did you hear him saying anything when the

2   paramedics arrived?

3      A.   I can't recall.

4      Q.   Okay.  Did you -- Did you hear him saying

5   anything else after -- Do you recall him saying

6   anything else from the time he was handcuffed to the

7   time that he was outside your presence?

8      A.   I can't recall if he said anything.

9      Q.   All right.  Now, did you see in the video

10  where Mr. Coleman was dragged down the hallway by his

11  handcuffs?

12     A.   I saw him being taken out of the cell, yes.

13     Q.   Okay.  And who was it that took him out of

14  his cell like that?

15     A.   I can't recall who took him.

16     Q.   Is that an approved way, policy way, to move

17  a prisoner after he's been handcuffed and he's unable

18  or unwilling to walk?

19     A.   If he's resisting or he's just dead weight

20  then you have to move him physically.

21     Q.   So if it takes dragging, then that's what you

22  would do?

23     MS. MARTIN:  Objection to the form of the

24  question.



# EXHIBIT J

Coleman vs. City of Chicago
Cedric Jordan - 05/13/2014                                      Page 1

1               IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

     PERCY COLEMAN, Administrator      )
4    for the Estate of PHILLIP         )
     COLEMAN,                          )
5                                      )
                        Plaintiff,     )
6                                      )
                  vs.                  ) No. 12 CV 10061
7                                      )
     THE CITY OF CHICAGO, CHICAGO      )
8    POLICE LIEUTENANTS MICHAEL        )
     RIGOLI, STAR NO. 235; CARLOS      )
9    MOSTEK, STAR NO. 196; and         )
     MICHAEL CASEY, STAR NO. 191;      )
10   CHICAGO POLICE SERGEANTS          )
     SEAN TULLY, STAR NO. 1090;        )
11   WILLIAM MEADOR, STAR NO.          )
     1003; and TOMMY WALKER, STAR      )
12   NO. 2328; and CHICAGO POLICE      )
     OFFICERS CORDY FOUCH, STAR        )
13   NO. 19814; MARK JONES, STAR       )
     NO. 10390; DAVID MONTGOMERY,      )
14   STAR NO. 10651; BRIAN HOOD,       )
     STAR NO. 10598; REGINALD T.       )
15   MALONE, STAR NO. 17484; and       )
     DETENTION AIDE KEITH              )
16   KIRKLAND,                         )
                                       )
17                      Defendants.    )

18

19          The deposition of CEDRIC JORDAN taken before
     Alexandra Szajna, Certified Shorthand Reporter and
20   Registered Professional Reporter, taken pursuant to the
     provisions of the Illinois Code of Civil Procedure and
21   the Rules of the Supreme Court thereof pertaining to the
     taking of depositions for the purpose of discovery at
22   300 West Adams Street, Suite 330, Chicago, Illinois,
     commencing at 12:55 p.m. on May 13, 2014.
23

24



Coleman vs. City of Chicago
Cedric Jordan - 05/13/2014                                        Page 13

1        A.    At the police department.

2        Q.    Okay.  When you say "carrying him," do you

3   mean he was in a stair chair?

4        A.    Yes.

5        Q.    And where did you see that photo?

6        A.    At 30 North LaSalle.

7        Q.    The attorney's office?

8        A.    Yes.

9        Q.    You saw just one photo?

10       A.    Yes.

11       Q.    Did you look at any video?

12       A.    No.

13       Q.    Did you ever serve in the military?

14       A.    No.

15       MR. BROWNE:   This will be Exhibit 1.

16                      (Jordan Deposition Exhibit No. 1

17                       marked as requested.)

18  BY MR. BROWNE:

19       Q.    Okay.  Mr. Jordan, you've been handed what's

20  been marked as Exhibit 1.  It's been Bates stamped by

21  the City attorneys.  It's pages 344, 345 and 346.  Do

22  you have all three pages?

23       A.    Mm-hmm.

24       Q.    Is that a yes?


JENSEN
Litigation Solutions

```
 1        A.    Yes.  I'm sorry.

 2        Q.    That's okay.  Everybody forgets.

 3              And then do you recognize this to be a copy of

 4    a run sheet?

 5        A.    Yes.

 6        Q.    Based upon your training and experience, are

 7    you familiar with how to read and understand the

 8    information contained in these run sheets?

 9        A.    Yes.

10        Q.    So I just want to go through with you some of

11    the information contained in this run sheet.  The

12    patient's name for this run sheet is Phillip Coleman; is

13    that correct?

14        A.    Yes.

15        Q.    And there are some -- there's a date and time

16    column; is that correct?

17        A.    Yes.

18        Q.    On the right-hand side.

19        A.    Yes.

20        Q.    It says, Dates, Times.  And there are

21    specific -- well, all the dates for each section are

22    December 13, 2012.  And to the right of each date, there

23    are some times; do you see those times?

24        A.    Yes.
```



Coleman vs. City of Chicago
Cedric Jordan - 05/13/2014

Page 21

1 closer to the 5th District than Roseland Community

2 Hospital?

3      A.    Roseland is closer.

4      Q.    Okay.  On the first page of this run sheet

5 under the Hx, that's an abbreviation for history; is

6 that correct?

7      A.    Yes, sir.

8      Q.    The complaint listed is unconscious; is that

9 correct?

10     A.    Yes, sir.

11     Q.    The onset was 15 minutes ago; is that correct?

12     A.    Yes, sir.

13     Q.    And it says it was provoked by strenuous

14 activity; do you see that?

15     A.    Yes, sir.

16     Q.    Now, the term unconscious, is that a term that

17 is entered manually by typing it in, or is that one of

18 the predetermined choices that you have to select?

19     A.    It's a drop box that has to be selected.

20     Q.    Okay.  Unconscious is one of the choices; is

21 that correct?

22     A.    Yes, sir.

23     Q.    And as a paramedic in charge, do you know --

24 what does it mean that a patient is unconscious?



Coleman vs. City of Chicago
Cedric Jordan - 05/13/2014

Page 22

```
 1          A.    As far as this report, or from my --

 2          Q.    Based upon your understanding, what does

 3    unconscious mean?  Let me rephrase that.

 4                As a paramedic in charge, what does it mean

 5    that a patient was unconscious?

 6          A.    I would say unresponsive.

 7          Q.    Okay.

 8          A.    Eyes closed, no movement.

 9          Q.    Now, in this particular instance, do you

10    recall Phil Coleman was unconscious at least when you

11    first encountered him?

12          A.    From sight, I would say so, yes.

13          Q.    Why -- Is there a distinction when you say

14    "from sight," as opposed to what?

15          A.    Well, if I walk in and see a person's eyes

16    closed, laying on the floor, I would assume that they

17    are unconscious until we do a further assessment to find

18    out different.

19          Q.    And in the case of Phillip Coleman on

20    December 13, 2012, was a further assessment done?

21          A.    Yes.

22          Q.    Okay.  And who did the assessment?  Was it

23    both of you or just yourself or somebody else?

24          A.    Engine 62 got there before us, so they would
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions